No.  22-1466

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

NATIONAL WILDLIFE FEDERATION, AMERICAN RIVERS, PRAIRIE RIVERS NETWORK, and MISSOURI COALITION FOR THE ENVIRONMENT,

Plaintiffs-Appellants,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers, MAJOR GENERAL RICHARD M. TOY, Commander of the Mississippi Valley Division of the Army Corps of Engineers,

Defendants-Appellees.

---

ON APPEAL FROM THE SOUTHERN DISTRICT OF ILLINOIS
NO. 3:20-cv-00443-DWD

---

APPELLANTS' OPENING BRIEF

---

STEPHAN C. VOLKER (CSB #63093)
ALEXIS E. KRIEG (CSB #254548)
STEPHANIE L. CLARKE (CSB #257961)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703
Tel:  (510) 496-0600
Fax:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants National Wildlife Federation, American Rivers, Prairie Rivers Network and Missouri Coalition for the Environment**,** submit the following disclosure statement.

Appellants National Wildlife Federation, American Rivers, Prairie Rivers Network and Missouri Coalition for the Environment are each non-profit corporations, and do not have any parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad.

October 12, 2022                    Respectfully submitted,

*/s/ Stephan C. Volker*
STEPHAN C. VOLKER
Attorney for Plaintiffs and Appellants
NATIONAL WILDLIFE FEDERATION, et al.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1466

Short Caption: National Wildlife Federation, et al., v. United States Army Corps of Engineers

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

✓    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Wildlife Federation, American Rivers, Prairie Rivers Network, and Missouri Coalition for the Environment

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Offices of Stephan C. Volker: Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke, Jamey M.B. Volker; Great

Rivers Environmental Law Center, Bruce A. Morrison; Dairyland Public Interest Law, Kathleen Henry

(3)　　If the party, amicus or intervenor is a corporation:

i)　　Identify all its parent corporations, if any; and

ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _Stephan C. Volker_    Date: March 29, 2022

Attorney's Printed Name: Stephan C. Volker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ✓

Address: Law Offices of Stephan C. Volker

1633 University Avenue, Berkeley, CA 94703

Phone Number: 510-496-0600    Fax Number: 510-845-1255

E-Mail Address: svolker@volkerlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1466

Short Caption: National Wildlife Federation, et al., v. United States Army Corps of Engineers

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  National Wildlife Federation, American Rivers, Prairie Rivers Network, and Missouri Coalition for the Environment

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Law Offices of Stephan C. Volker: Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke, Jamey M.B. Volker; Great

Rivers Environmental Law Center, Bruce A. Morrison; Dairyland Public Interest Law, Kathleen Henry

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s Alexis E. Krieg    Date: August 16, 2022

Attorney's Printed Name:  Alexis E. Krieg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  1633 University Ave

    Berkeley, CA 94703

Phone Number: (510) 496-0600    Fax Number:  (510) 845-1255

E-Mail Address: akrieg@volkerlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1466

Short Caption: National Wildlife Federation, et al., v. United States Army Corps of Engineers

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
National Wildlife Federation, American Rivers, Prairie Rivers Network, and Missouri Coalition for the Environment

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Law Offices of Stephan C. Volker: Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke, Jamey M.B. Volker; Great

Rivers Environmental Law Center, Bruce A. Morrison; Dairyland Public Interest Law, Kathleen Henry

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and
N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s Stephanie L. Clarke          Date: August 16, 2022

Attorney's Printed Name: Stephanie L. Clarke

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✔]

Address: 1633 University Ave

Berkeley, CA 94703

Phone Number: (510) 496-0600          Fax Number: (510) 845-1255

E-Mail Address: sclarke@volkerlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . i

**DISCLOSURE STATEMENT:  STEPHAN C. VOLKER** . . . . . . . . . . . . . . . ii

**DISCLOSURE STATEMENT:  ALEXIS E. KRIEG** . . . . . . . . . . . . . . . . . . iii

**DISCLOSURE STATEMENT:  STEPHANIE L. CLARKE** . . . . . . . . . . . . . iv

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

**STATEMENT OF DISTRICT AND APPELLATE COURT
JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **A.**   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **B.**   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **C.**   **STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        **1.**   **Summary of Issues and Project History** . . . . . . . . . . . . . . . 3

        **2.**   **The Mississippi River Is a Vital National Resource** . . . . . . 4

        **3.**   **History of Project and its Prior NEPA Reviews** . . . . . . . . . 5

        **4.**   **Congress Sought to Curtail the Project's Impacts** . . . . . . . 7

        **5.**   **The Project's Approval Perpetuates its
Worsening Effects** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        **6.**   **Current Project Activities** . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        **7.**   **Scientific Studies Demonstrate  Severely Declining
Ecological Conditions and the Project's Role in
Advancing Those Declines** . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        **8.**   **Federal Laws Protecting Wetlands and Floodplains
Have Strengthened, Expanding the Corps' Duties Here** . . 15

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    **I.**    **THE ORDER ERRONEOUSLY HOLDS THAT THE CORPS' FAILURE TO PREPARE A SPECIFIC MITIGATION PLAN DID NOT VIOLATE THE WATER RESOURCES DEVELOPMENT ACT OF 2007.**. . . . . . . . . . . . 18

        **A.**    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        **B.**    **THE WATER RESOURCES DEVELOPMENT ACT WAS AMENDED IN 2007 TO EXPAND THE DUTY TO PREPARE MITIGATION PLANS AS PART OF REPORTS SELECTING A PROJECT ALTERNATIVE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        **C.**    **THE ORDER CONTRADICTS AND NULLIFIES THE PLAIN LANGUAGE OF SECTION 2283(d)(1) BY INSERTING THE WORD "SUCH" INTO THAT PROVISION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        **D.**    **SECTION 2283'S PLAIN LANGUAGE IS REINFORCED BY THE RULES OF STATUTORY CONSTRUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        **E.**    **SECTION 2283'S LEGISLATIVE HISTORY FURTHER REINFORCES ITS PLAIN LANGUAGE**. . . 26

        **F.**    **THE TERM "REPORTS" IS NOT A TERM OF ART RESERVED FOR REPORTS TO CONGRESS**. . . . 27

        **G.**    **THE COURT'S CASE AUTHORITY IS DISTINGUISHABLE**. . . . . . . . . . . . . . . . . . . . . . . . 28

        **H.**    **THE CORPS FAILED TO PERFORM ITS WRDA MITIGATION PLAN DUTIES HERE**. . . . . . . . . . . . . 29

    **II.**    **THE ORDER ERRONEOUSLY HOLDS THE CORPS DID NOT VIOLATE NEPA**. . . . . . . . . . . . . . . . . . . . . . . . . . 33

        **A.**    **LEGAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . 35

        **B.**    **THE FSEIS' PURPOSE AND NEED STATEMENT IS TOO NARROW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1.    **The Purpose and Need Statement Improperly Limits Alternatives.**. . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.    **The Purpose and Need Statement Ignores Environmental Laws and the Project's Own Authorizing Legislation.**. . . . . . . . . . . . . . . . . . . . 39

3.    **The Purpose and Need Statement Fails to Demonstrate Project Need.**. . . . . . . . . . . . . . . . . . . 43

C.    **THE FSEIS IGNORES REASONABLE ALTERNATIVES.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

1.    **The FSEIS Allows Only a Binary Choice Between the Project and the Project Without New Training Structures.**. . . . . . . . . . . . . . . . . . 46

2.    **The FSEIS Ignores Alternatives Requiring Congressional Authorization.** . . . . . . . . . . . . . . . 48

3.    **The FSEIS Fails to Evaluate a Reasonable Range of Effective Alternatives.**. . . . . . . . . . . . . . 50

4.    **The FSEIS Fails to Provide Informed Consideration of Alternatives.**. . . . . . . . . . . . . . . 51

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7), FRAP 32(G), AND CIRCUIT RULE 32(C).** . . . . . . . . . . . . . . . . . . . . . . . 54

**CIRCUIT RULE 30(d) STATEMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**REQUIRED SHORT APPENDIX.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation and Tourism v. Morrison*
  ("*Alaska Wilderness*")
    67 F.3d 723 (9th Cir. 1995)...................................... 45, 46

*Bob Marshall Alliance v. Hodel*
    852 F.2d 1223 (9th Cir. 1988)............................... 44, 47, 51

*Brewster v. Gage*
    280 U.S. 327 (1930)............................................... 26

*Center for Biological Diversity v. U.S. Forest Serv.*
    349 F.3d 1157 (9th Cir. 2003)..................................... 8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*
    467 U.S. 837 (1984)........................................... 21, 23

*Citizens Against Burlington v. Busey* ("*Burlington*")
    938 F.2d 190 (D.C. Cir. 1991)......................... 37, 38, 41, 43

*Citizens Against Toxic Sprays v. Berglund*
    428 F.Supp. 908 (D.Or. 1977)................................... 45

*City of Bridgeton v. FAA*
    212 F.3d 448 (8th Cir. 2000)................................... 38

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*
    123 F.3d 1142 (9th Cir. 1997)................................... 37

*City of New York v. United States Dep't of Transp.*
    715 F.2d 732 (2d Cir. 1983)
      *cert. den.* 456 U.S. 1005 (1984)............................. 38

*Colorado Envtl. Coal. v. Dombeck*
    185 F.3d 1162 (10th Cir. 1999)................................. 50

*Davis v. Mineta*
    302 F.3d 1104 (10th Cir. 2002)................................. 49

*Doe v. Office of Refugee Resettlement*
    884 F.3d 269 (5th Cir 2018)................................... 28

*Earth Island Inst. v. U.S. Forest Service*
    442 F.3d 1147 (9th Cir. 2006)................................. 36

*Ecology Center v. Castaneda*
    574 F.3d 652 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Environmental Defense Center v. Bureau of Ocean Energy Mgt.*
    36 F.4th 850 (9th Cir. 2022).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 48

*Environmental Defense Fund v. Corps of Engineers*
    492 F.2d 1123 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Environmental Defense Fund v. Froehlke*
    473 F.2d 346 (8th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48

*Friends of Southeast's Future v. Morrison*
    153 F.3d 1059 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Friends of the Earth v. Army Corps of Engineers*
    109 F.Supp.2d 30 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Friends of the Earth v. Hall*
    693 F.Supp. 904 (W.D.Wash 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Fuel Safe Washington v. Fed. Energy Regulatory Comm'n*
    389 F.3d 1313 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hammer v. U.S. Dept. of Health and Human Services*,
    905 F.3d 517 (7th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Heartwood, Inc. v. U.S. Forest Service*
    73 F.Supp.2d 962 (S.D. Ill. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Highway 1 Citizens Grp. v. Mineta*,
    349 F.3d 938 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hiivala v. Wood*
    195 F.3d 1098 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Klamath-Siskiyou Wildlands Ctr. v. BLM*
    387 F.3d 989 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Kozak v. Hillsborough Cty.*
    644 F.3d 1347 (11th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Muckleshoot Indian Tribe v. U.S. Forest Service* ("*Muckleshoot*")
    177 F.3d 800  (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48, 50

*Nat'l Audubon Soc'y v. U.S. Dep't of Navy*
    422 F.3d 174 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*National Parks and Conservation Assn. v. Bureau of Land Management*
  ("*National Parks*")
  606 F.3d 1058 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39, 43

*Natural Resources Defense Council v. Callaway*
  524 F.2d 79 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Natural Resources Defense Council, Inc. v. Hodel*
  865 F.2d 288 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Natural Resources Defense Council, Inc. v. Morton* ("*NRDC*")
  458 F.2d 827 (D.C. Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48

*Neighbors of Cuddy Mountain v. U. S. Forest Service*
  ("*Cuddy Mountain*")
  137 F.3d 1372 (9th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pacific Coast Federation of Fishermen's Associations v.*
  *National Marine Fisheries Service*,
  482 F.Supp.2d 1248 (W.D. Wash. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Perrin v. United States*
  444 U.S. 37 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Pit River Tribe v. U.S. Forest Service*
  469 F.3d 768 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Pub. Emps. for Envtl. Resp. v. Hopper*
  827 F.3d 1077 (D.C. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Resources Ltd., Inc. v. Robertson* ("*Resources Ltd.*")
  35 F.3d 1300 (9th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46

*Robertson v. Methow Valley Citizens Council*
  490 U.S.332 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sandifer v. U.S. Steel Corp.*
  571 U.S. 220 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sauk Prairie Conservation v. U.S. Dep't of the Interior*
  944 F.3d 664 (7th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Save Our Cumberland Mountains v. Kempthorne* ("*Cumberland*")
  453 F.3d 334 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49

*Seattle Audubon Society v. Moseley*
  798 F.Supp. 1473 (W.D. Wash. 1992)
  *aff'd* 998 F.2d (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Sherr v. Volpe*
  466 F.2d 1027 (7th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sierra Club v. Espy*
  38 F.3d 792 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Sierra Club v. Norton*
  207 F.Supp.2d 1310 (S.D. Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sierra Club v. U.S. Dep't of Transp.*
  310 F.Supp.2d 1168 (D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Silva v. Lynn*
  482 F.2d 1282 (1st Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Simmons v. United States Army Corps of Eng'rs*
  120 F.3d 664 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*South Fork Band Council v. U.S. Dept. of Interior* ("*South Fork*")
  588 F.3d 718 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Southeast Alaska Conservation Council v. Fed. Hwy. Admin.*
  649 F.3d 1050 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*State of California v. Block*
  690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Swain v. Brinegar*
  542 F.2d 364 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
  566 U.S. 560 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Pritchett*
  470 F.2d 455 (D.C. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*U.S. v. Gonzales*
  520 U.S. 1 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*U.S. v. Manasche*
  348 U.S. 528 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*U.S. v. Melvin*
  948 F.3d 848  (7th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. v. LaFaive*
  618 F.3d 613 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Webster v. U.S. Department of Agriculture*
  685 F.3d 411 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Wilshire Westwood Assoc. v. Atlantic Richfield,*
  881 F.2d 801 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Wisconsin v. Weinberger*
  745 F.2d 412 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Wyoming v. U.S. Dep't of Agric.*
  661 F.3d 1209 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## STATUTES

United States Code, Title 5

  § 706(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  § 706(2)(A)-D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States Code, Title 16

  § 661 et seq. (Fish and Wildlife Coordination Act ("FWCA")). . . . . . . . . 2, 42
  § 662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
  § 1531 et seq. (Endangered Species Act ("ESA")). . . . . . . . . . . . . . . . . . . . 14

United States Code, Title 28

  § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  § 1442(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States Code, Title 33

  § 652. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  § 652 note. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  § 2282a(f)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
  § 2283. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 23, 26
  § 2283(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  § 2283(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

§ 2283(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
§ 2283(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33
§ 2283(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
§ 2283(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
§ 2283(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 2283(d)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
§ 2283(d)(3)(B)(I)-(vi). . . . . . . . . . . . . . . . . . . . . . . . . 19, 30, 33
§ 2283(d)(4)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
§ 2309a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 2316. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
§ 2316(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 2317(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States Code, Title 42

§ 1962-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 1962-3(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
§ 4321 et seq. (National Environmental Policy Act ("NEPA")). . . . . . . . . . . 4
§ 4331(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
§ 4331(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
§ 4332(2) (NEPA Section 102(2)). . . . . . . . . . . . . . . . . . . . . . . . . 34
§ 4332(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rivers and Harbors ("R&H") Act of 1927
ch. 47, Stat. 1010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

R&H Act of 1930, (ch. 847, Stats. 1930)
P.L. 71-520. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Water Resources Dev. Act ("WRDA") of 1986
(P.L. 99-662). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
§ 906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19
§ 1103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 1135. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

WRDA of 1990
(P.L. 101-640). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16

WRDA of 2007 (P.L.110-114)
§ 2031. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 2036. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
§ 2036(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 27
§ 8004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# REGULATIONS

Code of Federal Regulations, Title 33 (2017)

Part 325........................................................ 16
Part 332........................................................ 16
§ 209.140...................................................... 28
§ 230.15....................................................... 28
§ 236.4........................................................ 43
§ 385.12....................................................... 28
§ 385.26....................................................... 28

Code of Federal Regulations, Title 40 (2017)

Part 230........................................................ 16
§ 1500.1(a).................................................... 33
§ 1500.1(b).................................................... 34
§ 1500.1(f).................................................... 34
§ 1501.1(a).................................................... 34
§ 1501.3....................................................... 11
§ 1502.1....................................................... 34
§ 1502.2(a).................................................... 34
§ 1502.9........................................................ 4
§ 1502.14.................................................. 45, 48
§ 1502.14(c)............................................... 44, 49
§ 1502.16...................................................... 52

§ 1502.24...................................................... 36

Code of Federal Regulations, Title 40 (2020)

§ 1506.13...................................................... 33

# FEDERAL RULES

Federal Rules of Appellate Procedure

Rule 32(a)(7)(B)(I)............................................ 54

Rule 32(f)..................................................... 54

Rule 32(g)..................................................... 54

Federal Rules of Civil Procedure

    Rule 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Seventh Circuit Court of Appeals Rules

    Rule 30(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    Rule 30(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    Rule 32(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## OTHER AUTHORITIES

Corps' Engineer Regulation ("ER") 1105-2-100 (Corps' Planning Guidance
    Notebook) (22 April 2000) (Provided in Appellants' Appendix)
    2-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Cong. Record, Water Resources Development Act ("WRDA") of 2007 –
Conference Report, September 24, 2007 (Provided in Appellants' Appendix)
S11981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cong. Record, WRDA of 2007 – Senate, May 15, 2007
    (Provided in Appellants' Appendix)
    S6122. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Executive Order 11988
    42 Fed.Reg. 26951 (May 24, 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Executive Order 11990
    42 Fed.Reg. 26961 (May 24, 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

77 Fed.Reg 8631 (Feb. 14, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

77 Fed.Reg 14913 (March 13, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2A Singer, Sutherland Statutes and Statutory Construction,
    §46.06 (7th Ed. (Nov. 2021)) (Provided in Appellants' Appendix). . . . . . . . 24

Merriam-Webster.com Dictionary, Merriam-Webster,
    "any"
    https://www.merriam-webster.com/dictionary/any.
    (Accessed 6 Oct. 2022.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

## STATEMENT OF DISTRICT AND APPELLATE COURT JURISDICTION

The District Court exercised federal question jurisdiction under 28 U.S.C. § 1331 over the Defendants U.S. Army Corps of Engineers, et al.'s (collectively, "the Corps'") final agency action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(D).  This Court has jurisdiction to review its Judgment dismissing this action under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.  Did the District Court err in ruling the Water Resources Development Act ("WRDA") of 2007, 33 U.S.C. § 2283(d), did not require the Corps to prepare a specific mitigation plan before approving its Mississippi River Regulating Works Project ("Project") and Supplemental Environmental Impact Statement ("SEIS")?

2.  Did the District Court err in ruling the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4231 et seq., did not require the Corps to consider an alternative to the Project other than essentially the Project less one central component, and did not require the Corps to review related activities and impacts not assessed in the SEIS?

## STATEMENT OF THE CASE

### A.    INTRODUCTION

This is a public interest case to enforce federal environmental laws to protect and restore the extraordinary – but imperiled – habitat of the Middle Mississippi River brought by the National Wildlife Federation, American Rivers, Prairie Rivers Network, and Missouri Coalition for the Environment (collectively,

"Conservation Coalition" or "Coalition").  The Coalition contends the Corps must consider alternatives and mitigations that would reduce the adverse impacts on fish, wildlife and public safety of its continuing construction of hundreds of miles of river bank hardening and narrowing structures along the Middle Mississippi River.

The Coalition appeals the District Court's Order filed January 22, 2022 (Dkt. 55; "Order") (Appellants' Required Short Appendix ("RSA") 1-40) and Judgment filed January 25, 2022 (Dkt. 56) (RSA41) dismissing the Coalition's lawsuit, on two grounds.  The Court's Order mistakenly holds: (1)  the WRDA of 2007, 33 U.S.C. section 2283(d)(1), did not expand the Corps' duty to prepare mitigation plans to apply to its approval of the Project and its Supplemental Environmental Impact Statement; and (2)  NEPA does not require the Corps to consider an alternative to the Project other than the Project without new river training structures and to review related activities and impacts not assessed in the SEIS.

## B.    PROCEDURAL HISTORY

The Coalition filed this action in the Southern District of Illinois on May 13, 2020, challenging the Corps' approval of the Project and its Supplemental Environmental Impact Statement ("SEIS").   It alleged claims under the APA, the 2007 WRDA, NEPA, the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661 et seq., and the Rivers and Harbors ("R&H") Act of 1927 (ch. 47, Stat. 1010).  Appellants' Separate Appendix ("AA") 1-96.

The parties briefed their cross-motions for summary judgment under Fed.R.Civ.Pro. Rule 56 between February 15 and August 18, 2021.  Dkt. 34, 40,

43 and 49.  The Honorable David W. Dugan heard argument September 7, 2021.
Judge Dugan filed his Order denying the Conservation Coalition's motion and
granting the Corps' motion, and Judgment of Dismissal on January 25, 2022.

Plaintiffs timely appealed on March 22, 2022 (Dkt. 57).

## C.    STATEMENT OF FACTS

### 1.    Summary of Issues and Project History

The Middle Mississippi is a vital national resource for people and wildlife.
However, it has suffered a steep ecological decline due to the Project.  The
Coalition sued to compel the Corps to perform critical statutory duties to address
the severe adverse impacts of its Project on the 195-mile long Middle Mississippi
River between the Mississippi River's confluence with the Missouri River just
north of St. Louis, and its confluence with the Ohio River at the southern tip of
Illinois.  AA839-840, 872.

The Coalition appeals the District Court's Judgment upholding the Corps'
Record of Decision ("ROD") approving its 2017 Regulating Works Project and
Final SEIS ("FSEIS") on the Project's massive river training structures including
dikes, weirs, chevrons, and bank hardening revetments ("regulating works"), and
related "operations and maintenance" ("O&M") activities, intended to narrow the
Mississippi River, harden its banks, and scour a navigation channel at least nine
feet deep and 300 feet wide.

The ecological health of the MMR and its fish and wildlife populations are
declining because of growing habitat loss and degradation, much of which is being
caused by the Project.  Yet the Corps failed to consider alternatives and
mitigations to reduce the Project's impacts.  The Corps insisted it must continue

- 3 -

using outdated techniques Congress approved *110 years ago based on a Corps plan developed 139 years ago*. AA802-834, 840, 845, 857, 860. Its refusal to study, develop and describe alternatives other than the binary choice between the Project and the Project without new training structures violates NEPA.

WRDA and NEPA work together to identify solutions that cause less harm to the environment. WRDA requires the Corps to prepare a specific mitigation plan to reduce the Project's adverse impacts to ecological resources including fish and wildlife. The Corps failed to prepare this required plan, claiming the mitigation requirements of WRDA 2007 did not apply to the Project. The District Court agreed. Order 30-34. The Coalition shows why this ruling is mistaken on pages 18-33 below.

NEPA requires the Corps to examine and disclose the Project's environmental impacts, "study, develop and describe" a reasonable range of alternatives to reduce these impacts, and discuss scientific concerns about the Project in the EIS' text. 42 U.S.C. § 4321 et seq.; 40 C.F.R. §1502.9 (requiring EIS to discuss "any responsible opposing view"). Examining a reasonable range of alternatives assures that optimal ways to achieve a project's purposes with less environmental harm are fully explored. Yet the Court ruled the Corps complied with NEPA. Order 9-30. The Coalition shows why this ruling is mistaken on pages 33-52 below.

## 2.     The Mississippi River Is a Vital National Resource

The Mississippi River watershed drains 1,245,000 square miles including thirty-two states and two Canadian provinces. AA674. The Upper Mississippi

River System ("UMRS") includes the Middle Mississippi River ("MMR") and the river upstream of the Missouri River and portions of the Illinois, Kaskaskia, Minnesota, St. Croix, and Black Rivers.  AA836.  It has immense significance for wildlife and recreation.  It supports vast tracts of bottomland forest, wetlands, and aquatic habitats, and "more than 300 species of birds, 57 species of mammals, 45 species of amphibians and reptiles, 150 species of fish, and nearly 50 species of mussels."  AA406.  Nearly half of North America's migratory waterfowl and shorebirds depend on the Mississippi River Valley for seasonal or year-round habitat.  AA406.  Recreational opportunities in and around the rivers draw millions of visitors annually.  AA608.  These rivers supply water to nearby cities and farms, and support waterborne commerce.  AA406.

### 3.     History of the Project and its Prior NEPA Reviews

The R&H Act of 1927 authorized the Project, based on the 1926 Chief of Engineers' Report at paragraphs 55-57, 80, 84 (AA333-334, 340-341), which impose explicit limits on narrowing the Mississippi River's width:  once the river was "contracted" (i.e., constricted) to a width of 2,000 to 2,500 feet (depending on location) from bank-to-bank, the Corps was to maintain the deeper navigation channel (which is much narrower) only through dredging.  *Id*.  Congress rejected more aggressive contraction plans.  AA1017, 263-271 (discussing relevant documents).  The Project's 1,500 foot contraction (AA814, 1010-1015) ignores this restriction, resulting in significant environmental harm and increased flood risks for communities.  AA591, 618, 873, 885, 1040-1054.

The R&H Act of 1930 (ch. 847, Stats. 1930; P.L. 71-520), which authorized

a navigation channel nine feet deep and 400 feet wide, does not modify the 1927 R&H Act's bank-to-bank minimum width of 2000 feet, nor its direction to maintain the navigation channel by dredging. *Id*.

The Corps' St. Louis, Rock Island, and St. Paul districts individually issued four EISs on parts of the Project between 1974 and 1976, but each addressed only that district's portion. AA342, 619, 775-776. The Corps never reviewed the entire Project in a single EIS. In 1997, the St. Paul District issued another EIS that only addressed that district's maintenance activities, and not its operations or regulating works. AA350. Most river training structures are in the Rock Island and St. Louis districts. The 1997 EIS acknowledged it did not address the Corps' activities in the other districts, stating: "The major unresolved issue is the cumulative impacts of the continued operations and maintenance of the 9-foot navigation channel project." AA352.

Like the four EISs prepared in the 1970s and the fifth in 1997, the SEIS challenged here did not examine the impacts of the new types of river training structures the Corps has recently invented and begun installing, including bendway weirs, chevrons, and rootless weirs, for example, nor the impacts of its new and expanded operations and maintenance activities. AA821. Although the Corps prepared two additional EISs related to the rivers subsequent to 1997, neither addresses the Project's O&M activities, their impacts, and alternatives or mitigations that would avoid or reduce them. AA405-406, 837. For example, the 2004 EIS for the Navigation and Ecosystem Sustainability Project on the UMRS simply presented a four-paragraph "general overview of maintenance dredging activities and their respective role as ecological stressors," a single table showing

net arithmetic changes in acreage or lineal feet of certain river features between 1930 and 1973 (or some other years), and one paragraph stating that "newer structures such as bendway weirs [and] chevron dikes . . . are being studied to assess their effectiveness . . . and . . . habitat value . . . ." AA410-431.

### 4.    Congress Sought to Curtail the Project's Impacts

As the Corps built more training structures, Congress recognized the growing damage to the rivers and enacted several Water Resources Development Acts ("WRDA's") to reverse those impacts. The 1986 WRDA (P.L. 99-662) authorized the Corps to restore and improve the UMRS's ecological conditions. The 1990 WRDA (P.L. 101-640) directed the Corps to prioritize environmental protection. The 2007 WRDA (P.L. 110-114) expanded its mitigation mandate and authorized the Corps to carry out additional restoration projects in the UMRS. AA819-820.

### 5.    The Project's Approval Perpetuates its Worsening Effects

On August 31, 2017, the Corps issued a Record of Decision ("ROD") approving the FSEIS' Preferred Alternative (the Project) to continue constructing river training structures through at least 2034. AA840-842, 1010-1015. However, the FSEIS limits the decision maker to making a binary choice between (1) the status quo of continued construction of river training structures, revetment and operation and maintenance activities ("O&M"), and (2) no new training structures but the continued status quo of revetment and operation and maintenance, rather than examining a reasonable range of alternatives as NEPA directs. AA793, 801,

- 7 -

859-871, 947-979.

The FSEIS provides some discussion of "regulating works" activities such as river training structures, with only vague mentions of highly significant and environmentally impactful O&M activities and bank stabilization actions such as revetments. AA837, 867. The FSEIS simply assumes that the exact same O&M and bank stabilization actions will occur under either of the two alternatives, and provides no assessment of different alternatives for these highly significant activities. *Id.*

The FSEIS' omission conflicted with NEPA's purpose to "insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973). Thus, "where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response*." *Id.* (emphasis added). The response must be disclosed in "the final statement itself" to stimulate informed public comment. *Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1169 (9th Cir. 2003); *Friends of the Earth v. Hall*, 693 F.Supp. 904, 931 (W.D. Wash. 1988).

The Coalition explained below that the Corps buried a brief summary of responsible scientific opinion that river training structures narrow the river's channel and significantly increase flooding in an appendix. AA133-138, 239-240, 609-610, 613-615. The Coalition had asked the Corps to address published studies based on decades of river height records showing that river training

- 8 -

structures raise the river's height where the channel is narrowed and for miles upstream where flow is backed up. AA709-713, 737-749. The Corps did not disclose these studies or the Corps' responses in the body of the FSEIS. The Corps' "relegation [of opposing scientific opinion] to . . . the appendix was improper under NEPA." *Pacific Coast Federation of Fishermen's Associations v. National Marine Fisheries Service*, 482 F.Supp.2d 1248, 155 (W.D. Wash. 2007).

Similarly, the Coalition explained that the Draft and Final SEISs omit the Corps' Independent External Peer Review ("IEPR") Panel's comments. AA138, 243-244. The Coalition recited verbatim the IEPR's Panels' four findings (AA138, quoting AA985), and argued their omission from the Draft and Final SEISs was error because "[i]t is not sufficient to include the Panel's statements in a separate report or Appendix, as opposing expert views must be included and responded to in the EIS itself." AA138 (citing *Friends of the Earth v. Hall*, 693 F.Supp. at 934). The District Court did not address the Coalition's point that these findings should have been disclosed *in the EIS*. Order 24-25.[1]

_____

[1] The District Court criticized as "misleading" the Coalition counsel's statement that

> "[T]he IEPR Report also concluded that "the SEIS has little information on the hydraulic engineering date for the MMR." [AA992]. While the 1976 EIS contained data available then – over 45 years ago – that information is obsolete because both the hydraulics and hydrology of the Middle Mississippi River have changed significantly since 1976: [quote from AA873-874]."

AA136. The District Court correctly noted that the referenced sentence in its entirety reads: "Although the SEIS has little information on the hydraulic and hydrologic engineering data for the MMR, the 1976 EIS on the MMR was reviewed for this data and it was found to be complete and suitable for SEIS review." Order 24-25, quoting [AA992]. The Coalition should have recited the entire sentence and then explained the four reasons why the second part of the sentence – the part quoted by the District Court – was incorrect: (1) This sentence is actually not from the IEPR Report but instead a summary prepared by the Corps' consultant, Batelle, that

**6.      Current Project Activities**

The Project's construction, operations, and maintenance activities have changed substantially over the past several decades, with different types of structures – and far more – that have different impacts on river flow, water levels, riverbank erosion and fish and wildlife habitat.  Bendway weirs, commenced in 1989, are placed under water on the outside of a river bend, angled upstream and direct water toward the inside of the bend.  AA875-877.  Chevrons, begun in 2001, are arch-shaped dikes positioned away from the river banks, with the curve of the arch pointed upstream.  *Id.*  They split the river's flow, scouring the main channel and creating a second channel near the riverbank.  *Id.*  "Rootless" dikes, not attached to the streambank, are also being built.  *Id.*  By 2010, the Corps built at least 380 of these massive new river training structures in the MMR.  AA536-537, 759.  The Corps continues to dredge, place revetment, and dispose of dredged spoils.  AA841, 946.

Although the Corps prepared Environmental Assessments ("EAs") for some recent training structures, they tier off the obsolete 1976 EIS that the Corps

---

misstates the record; (2) only the first part of the sentence is correct because the IEPR Report never states that "the 1976 EIS on the MMR was reviewed for this data and it was found to be complete and suitable for SEIS review" or anything even remotely similar (AA993-996); (3) the IEPR Panel was never asked to review the 1976 SEIS (AA997 (listing the precise questions posed to the Panel)); (4) the 602-page 1976 EIS was not included among the 418 pages of "Documents to be Reviewed" that Batelle provided the Panel, and was instead only to be made available to the Panel as part of additional "Supplemental Information" (AA993).  In finding no NEPA violation, the District Court also relied on internal communications from Batelle suggesting the Panel ultimately agreed that the Corps' proposals to provide additional information would rectify the FSEIS' shortcomings, but again, this information needed to be in the FSEIS.  AA1006-1009).  The Draft SEIS is dated October 28, 2016, 15 days after the Final IEPR's completion.  AA982.

acknowledged is no longer valid due to "significant new circumstances and information on the potential impacts of the Regulating Works Project on the resources, ecosystem, and human environment [that] warrant the preparation of" an SEIS.  AA 592-600.  Additionally, these EAs are not detailed like an EIS is required to be.  40 C.F.R. § 1501.3.

> **7.     Scientific Studies Demonstrate Severely Declining Ecological Conditions and the Project's Role in Advancing Those Declines**

It is well recognized that the Project has caused and continues to cause significant environmental harm.  For example, a 1999 Report issued by the Long Term Resources Monitoring Program ("LTRMP") identified the Project as a major reason for this harm.  AA363, 367, 369, 371-372.  The LTRMP reports are based on "one of the most extensive and comprehensive data sets on any large river system in the world," compiled by the Corps, FWS, U.S. Geological Survey (USGS"), U.S. Environmental Protection Agency ("EPA"), and five states of the Upper Mississippi River System ("UMRS") – which includes the Middle Mississippi.  AA452.  The LTRMP's data have been examined in over 320 technical reports, 65 peer-reviewed publications, and publicly available management tools and models.  AA460.  The 2008 LTRMP Report states the Project's activities are a "stressor" and "heavily influence" the condition of the Upper Mississippi River, which is ecologically impaired in "all parts of the system."  AA446, 452, 457, 462, 466.

The 2008 Report concludes that "[t]he current condition of the [UMRS] is heavily influenced by its agriculture-dominated basin and by the dams, *channel*

*training structures, dredging, and levees that regulate flow distribution*." AA446 (emphasis added). While improved waste treatment and land use have helped, the Upper Mississippi remains highly degraded and faces substantial challenges including: (1) high sedimentation rates in some backwaters and side channels; (2) an altered hydrologic regime due to modifications of river channels, the floodplain, and land use, and from dam operation; (3) loss of connection between the floodplain and the river, particularly in the Upper Mississippi's southern reaches; (4) non-native species (*e.g.*, Asian carp, zebra mussels); (5) high levels of nutrients and suspended sediments; and (6) degradation of floodplain forest. AA446.

The 2008 Report explains that since the original EISs, scientific understanding of the effects of the Project has evolved, and shows they have caused severe ecological decline. AA458, 461, 469. Largely due to the Project,

> "[i]n all reaches, sedimentation has filled-in many backwaters, channels, and deep holes. In the lower reaches, sediments have completely filled the area between many wing dikes producing a narrower channel and new terrestrial habitat. Erosion has eliminated many islands, especially in impounded zones."

AA449. Since the original EISs, hundreds of studies have shown that sedimentation poses critical ecological problems for the river. AA359-361 (identifying 250+ sediment studies since 1976), 434-443 (referencing 100+ studies between 1979 and 2005)].

The 1999 LTRMP Report reveals that newly available scientific information shows how different river training structures and O&M activities interact and

impact the river's hydrological processes. AA367 (data "now beginning to reveal" how much habitat fish species need), 371 ("a growing body of ecological information indicates how important . . . annual flood zone inundation is"), 373 ("[t]his report marks the first time broad ecological criteria have been used to assess the reaches of the [UMRS]").

The Corps prepared reports in 1997 and 2016 that acknowledge the river training structures are harming the river. In a 1997 report to Congress, the Corps admitted that "conditions at even the most healthy sites within the [UMRS] are at least partially artificial, non-sustainable, and in a recognized state of degradation." AA358. In 2016, the Corps advised Congress that "habitat within the Upper Mississippi River is degrading at a rate of one to three percent annually. At these rates, the ecosystem is *declining one to four times faster than currently [sic] restoration efforts*." AA621 (emphasis added).

The scientific community now recognizes that river training structures increase flood heights ("stages"), and thus the frequency and severity of flooding, an impact ignored in the original EISs and buried in a scant few paragraphs in an appendix to the FSEIS. Between 1986 and 2013, at least 48 studies attributed increasing flood heights to the construction of instream structures, and at least 17 discussed this effect on the Mississippi River specifically. *E.g.* AA768-771. They show that river training structures have significantly increased flood levels by up to 15 feet in some locations and 6 to 10 feet over broad stretches where these structures are prevalent. AA480-519, 613. The Corps' 2014 EAs acknowledge "significant new circumstances and information on the potential impacts of the Regulating Works Project" that necessitated an SEIS. AA593-594 (citing newly

- 13 -

listed endangered species, and new information "on the impacts of river training structures and dredging on fish and macroinvertebrates" and "on the effects of navigation on fish and wildlife resources"), 596-597, 599-600.  The Netherlands is now modifying river training structures on the Rhine River to reduce this impact. AA568.  But instead of reducing flooding by *removing* these channel-narrowing structures, the Corps has decided to build *more* of them.

The Project is harming the Upper Mississippi River's fish and wildlife in ways not discussed in the SEIS.  Between 1976 and 1991, five of its species were listed as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §1531 et seq.  In May 2000, a FWS Biological Opinion concluded the Project would jeopardize the continued existence of the pallid sturgeon and the Higgins eye pearly mussel, cause incidental take of the least tern and the winged mapleleaf mussel, and likely harm the bald eagle.  *E.g.*, AA 392-399, 402-404.  In 2012, four mussel species that may inhabit the UMRS were listed.  77 Fed.Reg 8631 (Feb. 14, 2012); 77 Fed.Reg 14913 (March 13, 2012); AA887.  Mussels are an important food for mammals and fish, and filter the water, removing bacteria and fungi.  *Id*.  They attach to the river bottom and stabilize the river bed.  *Id.* Algae and insect larvae inhabit mussel shells, and attract fish who feed on them. *Id*.  Dredging and disposal of spoils kill mussels, as do clearing riverbeds and banks, and building channel structures.  *Id*.

Many other Upper Mississippi species are listed under individual states' endangered species acts, including recent additions reflecting the declining ecological conditions due to the Corps' expanded use of training structures. AA354-355, 521-522, 886, 1019-1020 (Wisconsin's list includes 16 fish species,

- 14 -

and mussels and turtles; Minnesota's list includes 10 fish species, four turtles, and many mussels).  FWS' 2000 Biological Opinion found the Project would "take" the least tern because river training and flow control drastically decreased its nesting and foraging habitat, diminished nutrient cycling, reduced populations of small fish, and rendered least tern nesting sites more vulnerable to land-based predators.  AA383-390.

Many bird species depend upon the Upper Mississippi and its shallow waters and adjacent mud flats for foraging.  AA 344, 523, 588-589, 601, 605.  The Project has reduced these areas and nearly eliminated seasonal inundation of the floodplain, depriving birds of these essential habitats.  *E.g.* AA390, 892.  The Project has reduced sandbars and beaches needed for nesting.  AA588-589.  The Project's dredging and channelization destroy habitat needed by many migratory and resident shorebirds.  AA401, 408.

These impacts are exacerbated by global warming.  AA432-433, 474-479.

### 8. Federal Laws Protecting Wetlands and Floodplains Have Strengthened, Expanding the Corps' Duties Here

Since the original Project EISs, federal laws protecting wetlands and floodplains have been strengthened substantially.  In 1977, President Carter issued Executive Order 11990, requiring federal agencies to minimize the destruction, loss, or degradation of wetlands, and Executive Order 11988, directing them to "reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains."  42 Fed.Reg. 26951, 26961 (May 24, 1977).  In 1986, Congress enacted specific mitigation requirements for the Corps' civil works

projects.  WRDA 1986 (P.L. 99-662) § 906, 33 U.S.C. § 2283.  It authorized the Corps to modify existing water resources projects and operations to improve the environment, and established the UMRS Environmental Management Program to replace and enhance habitat and provide resource monitoring.  *Id.* §§ 1103, 1135, 33 U.S.C. §§ 652, 2309a.

The WRDA 1990 (P.L. 101-640) established "environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects."  33 U.S.C. § 2316(a) (emphasis added).  The Act further establishes "an interim goal of no overall net loss of the Nation's remaining wetlands base . . . and a long-term goal to increase the quality and quantity of the Nation's wetlands, as defined by acreage and function."  33 U.S.C. § 2317(a)(1).

In 2007, Congress enacted strict mitigation requirements for Corps civil works projects applicable to all proposals submitted to Congress *or re-evaluated under NEPA*.  WRDA 2007 (P.L. 110-114), § 2036, 33 U.S.C. § 2283(d).  These include enhanced mitigation requirements for the Clean Water Act's section 404 regulatory program in 2008 (33 C.F.R. Parts 325 and 332, 40 C.F.R. Part 230).  Congress also established a new federal water policy requiring all Corps projects to protect and restore the environment and avoid harming floodplains.  WRDA of 2007 § 2031, 42 U.S.C. § 1962-3.

Recognizing that significant efforts were needed to repair the Project's ecological damage, in 2007 Congress authorized $1.7 billion to "ensure the environmental sustainability of the existing Upper Mississippi River and Illinois Waterway System" and directed the Corps to modify "operation of the Upper

- 16 -

Mississippi River and Illinois Waterway System to address the cumulative environmental impacts of operation of the system and improve the ecological integrity of the Upper Mississippi River."  WRDA of 2007 § 8004, 33 U.S.C. § 652 note.

This action seeks to reconcile the growing conflict between scientific and Congressional recognition of the need to better manage the Mississippi River and the Project's outdated and needlessly harmful river training structures.

## SUMMARY OF ARGUMENT

The Coalition raises two arguments:

First, the District Court erred in ruling that the specific mitigation plan requirements in WRDA 2007 (33 U.S.C. § 2283(d)) did not apply to this Project.

Second, the District Court erred in ruling that the Corps' failure to consider a range of alternatives other than the binary choice between continuing to build more river new training structures or not, based on an improperly narrow purpose and need statement, and related failure to review activities and impacts not assessed in the SEIS, complied with NEPA.

## STANDARD OF REVIEW

This Court "review[s] a summary judgment de novo." *Sauk Prairie Conservation v. U.S. Dep't of the Interior*, 944 F.3d 664, 669 (7th Cir. 2019).  The APA governs review of the Corps' compliance with WRDA and NEPA.  *Highway 1 Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003).  Under the APA, the court "shall . . . hold unlawful and set aside agency action . .  found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law; . . . (C) in excess of statutory jurisdiction, authority, or limitations . . . ; [or] (D) without observance of procedure required by law . . . ." 5 U.S.C. §706(2).

The requirements of NEPA and the 2007 WRDA are addressed below.

## ARGUMENT

**I.  THE ORDER ERRONEOUSLY HOLDS THE CORPS' FAILURE TO PREPARE A SPECIFIC MITIGATION PLAN DID NOT VIOLATE THE WATER RESOURCES DEVELOPMENT ACT OF 2007.**

### A.  INTRODUCTION

Section 2283(d) of WRDA requires "specific mitigation plans" "for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses," resulting from federal water resources projects. 33 U.S.C. § 2283(d)(1). Between 1986 and 2007, this requirement applied only when the Corps submitted a "proposal for the authorization of any water resources project to the Congress in any report" in which the proposal – absent mitigation – would result in a greater than "negligible adverse impact" on ecological resources and wildlife. *Id*. (1986). In 2007, Congress amended section 2283(d)(1) to *also* require mitigation plans in "any report" that "select[s] a project alternative," without limiting that requirement to reports to Congress. *See* Pub. L. No. 110-114, § 2036(a)(1). Congress did so by adding this bolded language:

> After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, **and shall not select a project alternative in any report**, unless such report contains [either a mitigation plan or a determination that any adverse ecological effects would be negligible].

- 18 -

*Id*. (emphasis added).  Once triggered, section 2283 requires the Corps to provide a detailed mitigation plan with many specified components.  33 U.S.C. § 2283(d)(3)(B)(i)-(vi).

## B. THE WATER RESOURCES DEVELOPMENT ACT WAS AMENDED IN 2007 TO EXPAND THE DUTY TO PREPARE MITIGATION PLANS AS PART OF REPORTS SELECTING A PROJECT ALTERNATIVE.

Congress' 2007 amendment of section 2283(d) added an *additional category of reports* for which a mitigation plan is required.  Before 2007, mitigation plans were only required for one category of reports:  the "submi[ssion of] any proposal for the authorization of any water resources project to the Congress in any report."  33 U.S.C. §2283(d)(1), enacted by P.L. 99-662, § 906.  In 2007, Congress added a second category:  the "select[ion of] a project alternative in any report."  33 U.S.C. § 2283(d)(1), as amended by P.L. 110-114, § 2036(a)(1).  Thus, Congress *expanded* the circumstances where the mitigation plan is required to include "any report" that "selects an alternative," whether or not the report includes a proposal to Congress.  *Id*.

Because here the Corps issued a "report" which "selects a project alternative" – the FSEIS, which selects the Project – and the Project will have greater than "negligible adverse impact on ecological resources," the Corps was required to include a "specific plan to mitigate for damages to ecological resources . . . created by such project."  *Id.*

But the Order erroneously holds it need not.  In reaching this decision, the Order criticized the Coalition's counsel for not including section 2283's previous

language, on the grounds its new language referenced the previous language with the term "such" reports.  Order 30.  It described counsel's argument as "misleading" because it "omit[ted] the part of the statute [33 U.S.C. § 2283(d)] that refers to *such reports* as those that are to be submitted as a proposal *to Congress*."  *Id*. fn. 6 (emphasis added).   The Order concluded that since the SEIS is not a report to Congress, the Corps had no duty to provide a mitigation plan for the Project's acknowledged, adverse effects.  Order 30-35.

However, the Coalition's counsel did not refer to this pre-WRDA 2007 category which is applicable only to *reports to Congress*, because the Coalition's claim was based on the new category of covered reports established in WRDA 2007 that requires a detailed mitigation plan for "any report" that selected an alternative regardless of whether or not it was submitted to Congress.  AA148.

### C.    THE ORDER CONTRADICTS AND NULLIFIES THE PLAIN LANGUAGE OF SECTION 2283(d)(1) BY INSERTING THE WORD "SUCH" INTO THAT PROVISION

The Order conflicts with section 2283(d)(1)'s plain language by interpreting the qualifying clause that establishes the second category of reports requiring a mitigation plan – "and shall not select a project alternative in any report" – to somehow include the term "such reports."  The Order states:

> "Specifically, NWF found it appropriate to omit the part of the statute that refers to *such reports* as those that are to be submitted *as a proposal to Congress*."

Order 30 fn. 6 (emphasis added).  But the second qualifying clause enacted in WRDA 2007 does not use the term "such reports," nor does it refer to the 1986

clause that establishes the first category of reports requiring mitigation.  The first and second qualifying clauses have different terms.  The operative terms in the first (1986) qualifying clause are "submit any proposal for the *authorization of any water resources project to Congress* in any report;" the operative terms in the second (2007) qualifying clause are "*select a project alternative in any report*." 33 U.S.C. § 2283(d)(1) (emphasis added).

Because the text of section 2283(d) is clear, "that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

And, because the pertinent terms of the 2007 amendment – "select a project alternative" and "in any report" – are not defined in the statute, they "will be interpreted as taking their ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Applying this rule, common usage and dictionaries are customarily employed to establish this meaning.  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227-28 (2014) ("salesman" defined by dictionaries); *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566-69 (2012); *U.S. v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020); *U.S. v. LaFaive*, 618 F.3d 613, 616 (7th Cir. 2010) (looking to "common usage").

Applying this rule to section 2283(d)(1), the adjective "any" as the qualifier in the phrase "and shall not select a project alternative in any report" means just what it says.  "Any" means "every" (*i.e.*, every report that selects an alternative) or "of whatever kind" (*i.e.*, a report of whatever kind that selects an alternative). Merriam-Webster.com Dictionary, Merriam-Webster,

https://www.merriam-webster.com/dictionary/any (accessed 6 Oct, 2022)
(AA1067).

Contrary to these controlling authorities, the Order does not give effect to
section 2283(d)'s plain language by examining the dictionary meaning, or the
common usage, of "select," "any" and "report." Instead, the Order interprets the
word "any" in the second qualifying clause of section 2283(d)(1) to mean "such."
Order at 30, fn. 6. But these terms have very different meanings. "Such" is
narrow, because it refers to a particular, previously referenced, subset of the thing
that is referenced. "Any," by contrast, is broad, as it imposes no limitation on the
thing that is referenced. As noted, it means "every" or "all." *U.S. v. Gonzales*,
520 U.S. 1, 5 (1997) ("the word "any" has an expansive meaning").

Fundamentally, the District Court failed to reckon with the plain meaning of
the enormously expansive modifier "any" that Congress inserted before the word
"report." As noted, where as here a term is not ambiguous, its plain meaning
controls. Even if the term "report" were ambiguous, it does not follow that the
term "any" is likewise ambiguous. It simply is not. The term "any" is, as
explained, as expansive and all-inclusive a modifier as the English language has to
offer.

The Order greatly compounded this error by improperly reading the word
"such" into section 2283(d)(1)'s second qualifying clause. The word "such" is not
found in that clause. With this addition, the Order fundamentally changed the
second qualifying clause from language that broadened the scope of the mitigation
plan requirement to extend to "any" reports that selected a project alternative to a
different, narrow term – "such" – that nullified Congress' use of the term "any," a

- 22 -

term that broadens the scope of this requirement.

The Order's interpretation also renders the 2007 language "select a project alternative" meaningless surplusage, since under the 1986 language, reports that selected a project alternative for a proposal to Congress already required mitigation.  Hence, it would not matter whether the report "select[ed] a project alternative."  According to the Order, the 2007 clause only referred to, and thus was subsumed within, the submission of any "reports . . . that are to be submitted *as a proposal to Congress*."  Order 30 (original emphasis).  However, since under the 1986 language, reports that selected a project alternative and were submitted to Congress already required mitigation, the Court's Order renders the 2007 addition of the term "select a project alternative" meaningless because it adds nothing to the statutory regime.

Because the Order directly conflicts with the 2007 amendment's plain language by substituting different language and rendering Congress' actual words meaningless surplusage, the Order should be reversed.

### D. SECTION 2283'S PLAIN LANGUAGE IS REINFORCED BY THE RULES OF STATUTORY CONSTRUCTION.

Because the language added by Congress in 2007 is unambiguous, "that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43.  Even if this language were ambiguous, and resort to rules of statutory construction were warranted, the Order's interpretation would still fail.  Three rules of statutory construction are pertinent, and all confirm that the Coalition's interpretation of section 2283(d) is correct.

- 23 -

The first rule of statutory interpretation is the "elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."  2A Singer, Sutherland Statutes and Statutory Construction, §46.06 (7th Ed. (Nov. 2021) (AA1066).  Under this canon, a statute should be construed "to give effect to all its provisions, *so that no part is inoperative or superfluous, void or insignificant . . . .*"  *Id.* (emphasis added).  Applying this rule to section 2283(d)(1) requires that the second clause be given independent meaning so that it is *not* rendered superfluous.

But that is exactly what the Order does:  it construes the second clause as adding nothing to the first clause by interpreting both clauses as applying only to reports to Congress.  The Order gives no meaning or effect at all to the fact that the second clause refers to a different category of reports, namely, those reports that "select a project alternative."  Consequently, the Order's interpretation of section 2283(d)(1) renders language adopted by Congress in the second clause a nullity, contrary to the foregoing "elementary" rule of statutory construction.  The only reason for Congress to write both separate clauses is to give each a different, and independent, meaning.  The Order contravenes this "elementary" rule.

The second rule of construction is *reddendo singula singulis*, or the "doctrine of the last antecedent."  As explained in *United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972), under this interpretive canon,  "[o]rdinarily, *qualifying phrases* are to be applied to the words or phrase immediately preceding and *are not to be construed as extending to others more remote*."  *Id.* (emphasis added).  There, as here, the question presented was whether qualifying phrases – in that case, the phrase "when on duty," applied to other groups named in a more

- 24 -

remote phrase. *Id.* at 459. The court held that it should not. *Id.*

So too here, the qualifying phrase used in the first clause of section 2283(d)(1) – *"*any proposal for the authorization of any water resources project to Congress*"* – should not be applied to the second, more remote clause – *"*shall not select a project alternative in any report.*" Accord, Wilshire Westwood Assoc. v. Atlantic Richfield*, 881 F.2d 801, 804-805 (9th Cir. 1989) (applying the doctrine, albeit differently from that urged by the plaintiffs).

Applying this canon here, section 2283(d)(1) is to be interpreted as follows:

(1) "After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, unless such report contains. . . ."

[and]

(2) "After [the Amendment's adoption in 2007], the Secretary . . . shall not select a project alternative in any report, unless such report contains . . . ."

Simply reading these independent clauses as they are written, without adding or subtracting any words as the Order mistakenly does, gives full effect to both qualifying clauses, allowing this section's mitigation plan requirement to be applied in the manner Congress' language directs.

The Order, by contrast, reads these independent qualifying clauses in exactly the opposite manner from that required by this rule of statutory construction. It modifies both clauses so they apply *only to reports submitted to Congress*, even though only the first qualifying clause is expressly subject to this qualification. The Order overlooks the different language in the second qualifying clause, rendering that language mere surplusage, as there would be no need for

- 25 -

Congress to separately refer to "any" reports that "select a project alternative" if only (and "any") reports requesting authorization from Congress triggered the mitigation plan requirement.

The third "cardinal principle of statutory construction is to save and not to destroy." *U.S. v. Manasche*, 348 U.S. 528, 538-39 (1955). When construing statutes, courts must "give effect, if possible, to every clause and word of a statute," *id.*, so that "no clause, sentence, or word" is rendered "superfluous, void, or insignificant." *Kozak v. Hillsborough Cty.*, 644 F.3d 1347, 1349-50 (11th Cir. 2011). Ensuring that all statutory terms are given operative effect is particularly important where, as here, Congress has specifically amended the provision at issue. "When Congress alters the wording of a statute, we presume that Congress intended a change in the law." *Hiivala v. Wood*, 195 F.3d 1098, 1103 (9th Cir. 1999) (citing *Brewster v. Gage*, 280 U.S. 327, 337 (1930)).

Because the District Court's interpretation violates these "cardinal" rules of statutory construction, it is erroneous and must be reversed.

### E. SECTION 2283'S LEGISLATIVE HISTORY FURTHER REINFORCES ITS PLAIN LANGUAGE.

Section 2283(d)(1)'s language is unambiguous and thus resort to legislative history unwarranted and impermissible. However, even if the language were ambiguous and legislative history could be considered, that history supports the Coalition's interpretation, and refutes the Order's. The second qualifying clause of the operative sentence was added in 2007 so that the Corps' duty to prepare mitigation plans also applied when it selects a project alternative in *any* report, not just when it submits a report to Congress. The Congressional Record of the

Conference Report Debate over section 2036(a) of the WRDA of 2007 (which
enacted 33 U.S.C. section 2283(d)(1)) supports this interpretation. It states: "The
increased mitigation requirements apply to *all* new studies and *any* other project
that must be reevaluated for any reason." Cong. Record, Water Resources
Development Act ("WRDA") of 2007 – Conference Report, September 24, 2007,
at S11981 (AA445) (emphasis added). The colloquy between Senators Feingold,
Boxer and Reid makes the same point. Cong. Record, WRDA of 2007 – Senate,
May 15, 2007 at S6122 (AA444).

### F.    THE TERM "REPORTS" IS NOT A TERM OF ART RESERVED FOR REPORTS TO CONGRESS

The Order is also premised on the erroneous supposition that "reports" is a
term of art in the context of WRDA that only refers to documents submitted to
Congress. Order 34. The Order cites, as an example, 33 U.S.C. section
2282a(f)(2), which refers to reports by the Chief of Engineers for certain water
resources projects. *Id*. The Court reasoned that because that particular reference
to the word "report" refers to a report that is submitted to Congress, that all
WRDA references to this term must likewise refer only to reports submitted to
Congress. Order 34-35. But this supposed syllogism makes no sense. Just
because some reports referenced in WRDA are reports to Congress does not mean
that all reports referenced in WRDA must be reports to Congress.

The Corps itself does not subscribe to that interpretation of the term
"report" in its own water resource project regulations. The Corps' implementing
regulations for water resources projects for such things as Everglades restoration,
flood control, and dam inspections, for example, also expressly use the word

"report" to describe documents *not* submitted to Congress. *See, e.g.*, 33 C.F.R. §
209.140 (detailing multiple "reports" the Corps must make to the Federal Energy
Regulatory Commission and/or otherwise keep private); *id*. § 230.15 ("District
commanders shall, upon request from interested agencies or the public, provide
reports on the progress and status of required mitigation and other provisions of
their decisions on Corps projects); *id*. § 385.12 (outlining pilot project design and
technical data reports that are not required to be submitted to Congress); *id*. §
385.26 (outlining project implementation reports to be approved by the Corps *or*
submitted to Congress).

### G.     THE COURT'S CASE AUTHORITY IS DISTINGUISHABLE.

The Order relies upon *Hammer v. U.S. Dept. of Health and Human Services*,
905 F.3d 517 (7th Cir. 2018), for its position that the statute is not ambiguous.
Order 31.  In *Hammer*, this Court engaged in the following statutory
interpretation:

> The language governing removal of ancillary proceedings states that
> "[i]f removal is sought for a proceeding *described in the previous*
> *sentence*, and there is no other basis of removal, only that proceeding
> may be removed to the district court." 28 U.S.C. § 1442(d)(1)
> (emphasis added). If "only" some portion of a proceeding is
> removable, then that necessarily implies that other portions of that
> proceeding are not. See *Doe* [*v. Office of Refugee Resettlement*], 884
> F.3d [269,] 273 n.8 [(5th Cir 2018)]

*Id.*, 905 F.3d at 528 (emphasis added).  There, the statute referred explicitly to "the

previous sentence" and plainly stated how Congress intended its language to apply.  Here, in contrast, the language of the second independent clause in section 2283(d)(1) does *not* refer back to the preceding clause, and instead presents two independent clauses:

> After November 17, 1986, the Secretary *shall not submit any proposal for the authorization of any water resources project to Congress in any report, and shall not select a project alternative in any report*, unless such report contains . . . .

*Id*.

The contrast between the two statutes could not be greater.  Consequently, the District Court's reliance on *Hammer* is misplaced.

## H.    THE CORPS FAILED TO PERFORM ITS WRDA MITIGATION PLAN DUTIES HERE.

The District Court mistakenly did not reach the merits of Plaintiffs' WRDA claim.  Order 30-35.  This error was prejudicial because had the Court reached the issue, the evidence showed that the Corps violated WRDA in two respects.  First, WRDA requires the Corps to prepare a detailed mitigation plan to reduce the adverse impacts to ecological resources of any water resources project authorized by the Army Secretary and for which construction commenced after November 17, 1986, unless the Secretary determines the project "will have negligible adverse impact on ecological resources . . . without the implementation of mitigation measures."  33 U.S.C. §§ 2283(a)(1), 2283(d)(1).  After 2007, the Corps "shall not select a project alternative in any report, unless such report contains (A) a recommendation with a specific plan to mitigate for damages to ecological

resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project, or (B) a determination by the Secretary [of the Army] that such project will have negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures."  33 U.S.C. § 2283(d)(1).

Because the Corps has issued a "report" that "select[s] a project alternative" – the Draft and Final SEISs – on the Project, and the Army Secretary has not found the Project will have only "negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures," the Corps is required to mitigate the Project's adverse impacts on those "ecological resources and fish and wildlife." *Id.*  To ensure this happens, the Corps is prohibited from selecting a "project alternative in any report" unless that report includes a "specific plan to mitigate fish and wildlife losses." *Id.* Accordingly, the FSEIS must include a specific mitigation plan.

The required plan must ensure that "impacts to bottomland hardwood forests are mitigated in-kind, and other habitat types are mitigated to not less than in-kind conditions, to the extent possible."  33 U.S.C. § 2283(d)(1).  The Corps "shall select and design mitigation projects using a watershed approach to reflect contemporary understanding of the science of mitigating the adverse environmental impacts of water resources projects."  33 U.S.C. § 2283(d)(2). Mitigation plans "shall include, at a minimum," six specific components, none of which were included here.  33 U.S.C. § 2283(d)(3)(B) at (i) - (vi).

The Corps' mitigation plans must also comply with "the mitigation standards and policies established pursuant to the regulatory programs

administered" by the Corps.  33 U.S.C. § 2283(d)(3)(A).  These standards impose additional requirements for the detailed mitigation plan to ensure mitigation implementation and ecological success.  Congress further acknowledged the importance of mitigation and the mitigation plan requirements by requiring the Corps to consult yearly with the appropriate Federal resource agency on the status of the mitigation efforts and compliance with the ecological success criteria required by the mitigation plan.  33 U.S.C. § 2283(d)(4)(B).

Contrary to WRDA, the FSEIS does not provide a specific plan to mitigate the adverse impacts of the Project that satisfies the requirements discussed above, including the requirement to monitor mitigation efforts until it can be demonstrated that the mitigation has been ecologically successful.  Instead it simply provides a list of possible mitigation activities that "may include, but are not limited to, the following:  wing dike notching, dike removal, wing dike creation using alternative designs (*e.g.*, rootless dikes), use of rock piles, dredging or material placement of sand, and other possible activities" and equivocates that "[t]he ability to design for such habitat, including the associated costs, may need to be carefully considered within the context of the impacts.  Impacts will be mitigated to the extent practicable."  AA651.

The FSEIS asserts, incorrectly, that the Corps need not carry out the foregoing required mitigation of the Project's impacts on ecological resources including fish and wildlife if funds are not available through the Project.  AA654.  Not so.  As discussed, mitigation is required as a matter of law for any elements of the Project being carried out pursuant to "any report" where a project alternative was selected.  33 U.S.C. § 2283(d).  The Corps must mitigate the adverse impacts

of the Project, and the cost of carrying out that mitigation is a Project cost. 33
U.S.C. § 2283(c); Corps' Planning Guidance Notebook, Corps' Engineer
Regulation 1105-2-100 (22 Apr 2000) at 2-5 (AA378). Mitigation costs are a
project cost and allocated to the appropriate project purpose (the purpose requiring
the mitigation) and cost-shared accordingly. Cost-shared mitigation costs include
the costs of lands, easements, rights-of-way, and relocations needed to implement
the mitigation. *Id*. at 2-12.

Tacitly acknowledging that it failed to prepare a detailed mitigation plan as
required by 33 U.S.C. §§ 2283(a)(1) and (d)(1) to reduce the Project's adverse
impacts to wildlife resources, the Corps also argued below not just that this duty
did not apply to the Project as discussed above, but also that section 2283(a)(1)
"applies only to projects that had not commenced construction on November 17,
1986," and "the Project has been in construction for over 100 years." AA212.

This interpretation ignores this section's language expressly *including*
projects authorized "*before*, on or after November 17, 1986," which forecloses
exemption of previously authorized projects. It also ignores the fact that its
challenged approval occurred, and the approved construction will occur, more
than three decades *after* the November 17, 1986, trigger date. The Corps' stated
purpose of its SEIS was to provide a factual basis for its decision whether –
decades after Congress' trigger date – to approve a broad *new* phase of
construction to install "approximately 4.4 million tons (2.9 million cubic yards) or
rock" for hundreds more river training structures over the next several decades, or
instead, to "not construct[] any new river training structures." AA1111-1112. If
deciding whether to approve this enormous project was not the purpose, then the

entire exercise – preparation of the FSEIS, its circulation to the public, and the submission of thousands of good faith comments by federal agencies, states, organizations, and members of the public – was mere shadow play, rendering the entire process a charade.

The Corps argued in the alternative that it did prepare the required mitigation plan, but as just explained, it never showed compliance with Congress' very precise roadmap directing what this detailed plan must contain.  AA212-215; 33 U.S.C. § 2283(d)(3)(B) at (i) - (vi).   Section 2283, subsections (a)-(d) set forth specific steps the Corps must take, and enumerate detailed components the required plan must include.  Because the Corps violated these WRDA mitigation plan mandates, its approval of the Project must be set aside.

## II.    THE ORDER ERRONEOUSLY HOLDS THE CORPS DID NOT VIOLATE NEPA

The District Court ruled the Corps did not violate NEPA.  Order 9-23.  The Court erred in two critical respects.  First, it ruled that the Corps' Purpose and Need Statement was not unduly narrow.  Order 12-16.  Second, it ruled that the Corps considered a reasonable range of alternatives.  Order 16-20.  These errors are discussed below.

### A.    LEGAL BACKGROUND

NEPA is this country's "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).[2]  Recognizing the profound impact of human activity on the natural environment, 42 U.S.C. § 4331(a), NEPA requires

---

[2]  NEPA regulations were revised in 2020 and 2022.  Plaintiffs properly cite the regulations in place at the time of the Corps' action, 2017.  40 C.F.R. § 1506.13 (2020).

federal agencies to not only avoid, minimize or mitigate harm, but also to use "all practicable means . . . to restore and enhance" the environment. 40 C.F.R. § 1500.1(f). Section 102(2) of the Act contains "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." *Id*. § 1500.1(a). The broadest and most profound action-forcing requirement is the duty to prepare a detailed environmental impact statement ("EIS") for any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

"The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id*. §§ 1502.1, 1500.1(b). The EIS must "be supported by evidence that the agency has made the necessary environmental analyses." *Id*. It must be "analytic rather than encyclopedic." *Id*. § 1502.2(a).

These requirements are designed to ensure that NEPA's environmental protection policies are integrated into decision-making and provide a means by which decision-makers and the public can evaluate the environmental impacts of government proposals. *Id*. §§ 1501.1(a), 1502.1. To this end, NEPA requires federal agencies to take a "hard look" at the potential direct, indirect and cumulative impacts of its proposed actions. *Pub. Emps. for Envtl. Resp. v. Hopper*,

827 F.3d 1077, 1083 (D.C. Cir. 2016)*; Wisconsin v. Weinberger*, 745 F.2d 412, 416-428 (7th Cir. 1984); *Swain v. Brinegar*, 542 F.2d 364, 369-371 (7th Cir. 1976);  *Sherr v. Volpe*, 466 F.2d 1027, 1031-1035 (7th Cir. 1972); *Heartwood, Inc. v. U.S. Forest Service*, 73 F.Supp.2d 962, 977-980 (S.D. Ill. 1999).

"The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgment of potential environmental harms."  *Nat'l Audubon Soc'y v. U.S. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S.332, 350 (1989)); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 296 (D.C. Cir. 1988).  To meet this standard, the agency must base its EIS analysis on, and present, "quantified or detailed information."  *Neighbors of Cuddy Mountain v. U. S. Forest Service* ("*Cuddy Mountain*"), 137 F.3d 1372, 1379 (9th Cir. 1998); *Ecology Center v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009) (requiring "quantified or detailed data"); *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 87 (2d Cir. 1975).  "General discussion of an environmental problem over a large area" is not sufficient and cannot satisfy NEPA.  *South Fork Band Council v. U.S. Dept. of Interior*, 588 F.3d 718 (9th Cir. 2009); *Cuddy Mountain*, 137 F.3d 1379-80.  The reasons for this requirement are compelling:

> "A conclusory statement unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind not only fails to crystalize the issues, but affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives."

*Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473, 1479 (W.D. Wash. 1992),

*aff'd* 998 F.2d (9th Cir. 1993); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989,995-996 (9th Cir. 2004) ("generalized or conclusory statements" in cumulative effects analyses do not satisfy NEPA); *Friends of the Earth v. Army Corps of Engineers*, 109 F.Supp. 2d 30, 38 (D.D.C. 2000) (the Corps must "provide further analysis" to satisfy NEPA because it did not provide "the basis for any" of its claims the project would have an insignificant impact); *Sierra Club v. Norton*, 207 F.Supp.2d 1310, 1335 (S.D.Ala. 2002) ("Defendant's argument in this case would turn NEPA on its head, making ignorance into a powerful factor in favor of immediate action where the agency lacks sufficient data to conclusively show not only that proposed action would harm an endangered species, but that the harm would prove to be 'significant'").  40 C.F.R. § 1502.24 ("Agencies shall insure professional integrity, including scientific integrity, of the discussions and analysis in environmental impact statements"); *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1159-60 (9th Cir. 2006) (quoting 40 C.F.R. §1502.24)

The Corps' FEIS fails these standards, as shown below.  Therefore the Corps' approval of the Project must be vacated.

## B.    THE FSEIS' PURPOSE AND NEED STATEMENT IS TOO NARROW.

The Purpose and Need Statement is drawn so narrowly that only the Project as proposed could qualify.  Consequently, other, reasonable alternatives were eliminated.  AA847, 856, 859.

### 1.  The Purpose and Need Statement Improperly Limits Alternatives.

A Purpose and Need Statement "delimit[s] the universe of the action's reasonable alternatives."  *Citizens Against Burlington v. Busey* ("*Burlington*"), 938

F.2d 190, 195 (D.C. Cir. 1991); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209,
1244 (10th Cir. 2011) ("how the agency defines the purpose of the proposed
action sets the contours for its exploration of available alternatives."); *Sierra Club
v. U.S. Dep't of Transp.*, 310 F.Supp.2d 1168, 1192 (D. Nev. 2004) (citing *City of
Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997))
("only alternatives that accomplish the purposes of the proposed action are
considered reasonable, and only reasonable alternatives require detailed study");
*Webster v. U.S. Department of Agriculture*, 685 F.3d 411, 422 (4th Cir. 2012).

> The Corps' Purpose and Need Statement is narrowly drawn, stating:
> Congress provided the manner in which the navigation channel for the
> MMR should be obtained and maintained via the original Regulating Works
> Project authorization in 1910 and a modification to the authorization in
> 1927. *The purpose of this SEIS is not to consider a change to that
> authorization through reevaluating the need for the Regulating Works
> Project or the methods to be used to accomplish the goals of the project.*
> Rather, this document analyzes the impacts of the Regulating Works Project
> as it is currently constructed, operated and maintained with current
> information that has become available since completion of the 1976 EIS.

AA840 (emphasis added). Because the FSEIS' Purpose and Need Statement
assumes that only regulating works can achieve the Project's purposes, and
declines to evaluate other "methods to . . . accomplish the goals of the project,"
the FSEIS only considered two options: the "The Continue Construction
Alternative (No Action)," and "The No New Construction Alternative." AA840-
841, 847, 859. The "Continue Construction Alternative" is the Project (which is

river training structures and other O&M (including revetment and dredging); the
"No New Construction Alternative" is the sole alternative (which is continued
O&M (including revetment and dredging) but no new river training structures).
*Id*.  Thus, O&M is presumed to remain the same under either alternative.

Constrained by this narrow direction, the FSEIS dismissed other reasonable
alternatives and essentially preordained approval of the Project, since it was the
only option that would allow the continued construction of river training
structures.  AA859-860.  This violates NEPA:

> "One obvious way for an agency to slip past the strictures of NEPA is
> to contrive a purpose so slender as to define competing "reasonable
> alternatives" out of consideration (and even out of existence). . . . If
> the agency constricts the definition of the project's purpose and
> thereby excludes what truly are reasonable alternatives, the EIS
> cannot fulfill its role."

*Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir.
1997); *City of New York v. United States Dep't of Transp.*, 715 F.2d 732, 743 (2d
Cir. 1983), *cert. den.* 456 U.S. 1005 (1984) (an agency may not "narrow the
objective of its action artificially and thereby circumvent the requirement that
relevant alternatives be considered"); *Burlington*, 938 F.2d at 196; *Fuel Safe
Washington v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1324 (10th Cir.
2004); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir.
1998); *City of Bridgeton v. FAA*, 212 F.3d 448, 458 (8th Cir. 2000); *National
Parks and Conservation Assn. v. Bureau of Land Management* ("*National Parks*"),
606 F.3d 1058, 1070 (9th Cir. 2010); *Environmental Defense Center v. Bureau of*

*Ocean Energy Mgt*., 36 F.4th 850, 876 (9th Cir. 2022).

The FSEIS' Purpose and Need Statement effectively mandates continuation of river training structure and revetment construction to reduce dredging costs, regardless of flood risks and ecological impacts, and disregards other less impactful alternatives.  AA847.

### 2. The Purpose and Need Statement Ignores Environmental Laws and the Project's Own Authorizing Legislation.

The FSEIS' Purpose and Need Statement asserts that "[t]he long-term goal of the Project, as authorized by Congress, is to obtain and maintain a navigation channel and reduce federal expenditures by alleviating the amount of annual maintenance dredging *through the construction of regulating works*."  AA839 (emphasis added), 847.  This statement conflicts with the Corps' "statutory authorization to act," which provides instead that once the river's minimum width is reached, the Project is to be maintained by dredging rather than by installing more training structures that further narrow the river in violation of the minimum widths Congress established.

The Corps' authority to construct and operate a project is limited by its authorizing legislation, which typically adopts the recommendations (and any limitations) set forth in the project's Chief of Engineers Report.  The Project was authorized by the R&H Act of 1927 (ch. 47, 44 Stats. 1010), which stated:  "The existing project is hereby modified in accordance with the recommendations submitted by the Chief of Engineers . . . dated December 17, 1926. . . ." The 1926 Chief of Engineers Report established the following explicit limitations on the Project:

- 39 -

(1) Constriction of the channel through regulating works and revetment is limited to a conservative width of 2,500 to 2,000 feet at low water, as follows: 2,250 foot contraction at low water from River des Peres to Grays Point; 2,500 foot contraction at low water from Commerce to Commercial Point, and 2,000 foot contraction at low water from Commercial Point to Ohio River (AA334) (1926 Chief of Engineers Report – December 17, 1926 (69th Congress, 2d Session, Doc. No. 9) ("1926 Chief's Report") at paragraph 57); and

(2) That after completion of regulating works, dredging be continued, as needed, to maintain a channel 9 feet deep and 300 feet wide with requisite increased width at bends: *Provided*, That dredging of channels deeper than 8 feet and wider than 200 feet be authorized only when the needs of navigation then existing are not adequately met by such 8-foot channel.

AA333-334, 340-341. The 1926 Chief's Report explicitly rejected even narrower contractions of the river:

"The contraction to be brought about by the regulating work proposed is a conservative one. The practical result of these works will be merely narrowing the abnormally wide sections of the river to the present mean widths. The project of 1881 contemplated contraction to a width of about 2,500 feet. Through St. Louis Harbor a contraction to a low-water width of 1,500 feet to 1,800 feet has been carried out. The contraction proposed causes much less change in the original condition of the river than either the project of 1881 or the work in St. Louis Harbor. *Calling for very little change from the*

- 40 -

*original condition of the river, the equilibrium of natural forces in the*
*river will be but slightly disturbed.*"

*Id*. (emphasis added).

As a result, Congress established very specific limits on the Project – once the river was contracted to a width of 2,000 to 2,500 feet (depending on location), the Corps was to maintain the navigation channel only through dredging as needed. Congress also expressly rejected more aggressive contraction plans. The Corps' unauthorized approval of the 2017 FSEIS that retains the 1,500 foot contraction (AA814, 1010-1015) threatens environmental harm and flood stage increases forbidden under the plan authorized by Congress.

In sum, the Project exceeds the explicit limits of the 1927 authorization by: (1) utilizing a 1,500 contraction plan; (2) building river training structures to achieve the unauthorized 1,500 foot contraction plan; and (3) building river training structures to reduce dredging costs associated with maintaining the navigation channel even where both the authorized (2,000 to 2,500 foot) and unauthorized (1,500 foot) contraction widths have been achieved.

In preparing an EIS, "an agency should always consider the views of Congress, expressed . . . in the agency's statutory authorization to act." *Burlington*, 938 F.2d at 196. In addition to considering the foregoing direction from 1927, the Corps was obliged to consider "other Congressional directives," such as the WRDA of 2007, which established a new policy directing that "all water resources projects" should "protect[] and restor[e] the functions of natural systems and mitigat[e] any unavoidable damage to natural systems." *Id*.; 42 U.S.C. § 1962-3(a)(3). This law expands upon NEPA's command that the

- 41 -

"Federal Government . . . use all practicable means" to, among other things: (i) "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;" (ii) ensure "safe, healthful, productive" surroundings for all Americans; and (iii) "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b).

These imperatives are repeated in (1) the Corps' longstanding civil works mitigation requirements (33 U.S.C. § 2283(d)), (2) the WRDA of 1990 (33 U.S.C. § 2316) that changed the Corps' mission to "include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects," and (3) the Fish and Wildlife Coordination Act, which directs that "wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource development," and that such development prevent harm to, and improve the health of, fish and wildlife. 16 U.S.C. §§ 661, 662. The Corps' regulations likewise command:

> "Enhancement of the environment is an objective of Federal water resource programs to be considered in the planning, design, construction, and *operation and maintenance of projects*. Opportunities for enhancement of the environment are sought through each of the above phases of project development. Specific considerations may include, but are not limited to: *actions to preserve or enhance critical habitat for fish and wildlife, maintain or enhance water quality* [*and*] improve *streamflow*; preservation and

restoration of certain cultural resources; *and the preservation or creation of wetlands*."

33 C.F.R. § 236.4 (2017) (emphasis added).  The FSEIS fails to incorporate these critically important Congressional directives, and longstanding Corps policy objectives, into the Project's purpose as required by law.  AA843-847, 857-859; *Burlington,* 938 F.2d at 196; *National Parks,* 606 F.3d at 1070-1072.

### 3.    The Purpose and Need Statement Fails to Demonstrate Project Need

The Purpose and "Need" Statement must by definition, demonstrate a public "need" for new river training structures and additional revetment, as opposed to other channel-maintenance options, since the current dredging regime *already* maintains the channel.  *National Parks*, 606 F.3d at 1071; AA855-858.  The FSEIS fails to do so.  Rather, the Corps admits that its actual purpose is, *instead*, to reduce dredging costs.  AA847.

But Congress has not identified reduced dredging costs as an objective of the Project.  Moreover, even if this were a Congressionally-recognized purpose of the Project, the Corps provides no showing that construction of these structures would cost less than dredging the channel, let alone that the cost of constructing these structures would be less than the costs of dredging in combination with the very significant costs of the increased flooding and ecological harms the structures cause.  AA656-668, 840-841, 848-853.

Nor does the FSEIS examine the future costs with, and without, new training structures, nor clearly identify those areas needing continued dredging even with new training structures.  AA848-853.  The FSEIS also fails to provide

critical information on sediment loads and sediment transport in the MMR, precluding the public from assessing the need for more training structures. These omissions violate NEPA. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (NEPA requires an "informed and meaningful" consideration of alternatives).

### C.    THE FSEIS IGNORES REASONABLE ALTERNATIVES

An EIS must rigorously explore all reasonable alternatives that may achieve the primary objective and are not remote or speculative; thus, a viable but unexamined alternative renders an EIS inadequate. *Muckleshoot Indian Tribe v. U.S. Forest Service* ("*Muckleshoot*"), 177 F.3d 800, 810, 814 (9th Cir. 1999); *Natural Resources Defense Council, Inc. v. Morton* ("*NRDC*"), 458 F.2d 827, 836 (D.C. Cir. 1972).   An alternative may not be disregarded merely because it does not offer a complete solution to the problem, nor because it would require Congressional action. To the contrary, the EIS must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency."[3] Failure to examine an appropriate range of alternatives renders an alternatives analysis inadequate. *Resources Ltd., Inc. v. Robertson* ("*Resources Ltd.*"), 35 F.3d 1300, 1307 (9th Cir. 1993).

The greater the impacts and scope of the proposed action, the greater the

---

[3]  40 C.F.R. § 1502.14(c) (2017); *NRDC*, 458 F.2d at 834-836 (alternative energy sources had to be discussed, despite legislation finding urgent need for offshore leasing and mandating import quotas; agency had to consider reasonable alternatives to offshore oil lease which might reduce need for offshore exploration, even though that would require new legislation); *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1974) (acquisition of land to mitigate loss of land from river channel project must be considered even though it would require legislation).

range of alternatives that must be considered.[4]  The range is not sufficient if each alternative has a similar end result.  *State of California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (range of alternatives inadequate where all eight alternatives developed a substantial portion of wilderness).

The FSEIS fails to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14 (2017), and provide a "thorough consideration of all appropriate methods of accomplishing the aim of the action" and an "intense consideration of other more ecologically sound courses of action." *Environmental Defense Fund v. Corps of Engineers,* 492 F.2d 1123, 1135 (5th Cir. 1974).  Rigorous and objective evaluation of all reasonable alternatives is the "heart of the environmental impact statement," and "must be undertaken in good faith" rather than "to justify a decision already reached."  40 C.F.R. § 1502.14 (2017); *Citizens Against Toxic Sprays v. Berglund*, 428 F.Supp. 908, 933 (D.Or. 1977).

The FSEIS' alternatives analysis is inadequate in four principal respects: (1) it limits alternatives to just one binary choice between two options:  the Project as proposed (i.e., the status quo), and the Project without new training structures (*i.e.*, all aspects of the status quo project except new training structure construction) (AA840-841); (2) it refuses to consider alternatives requiring additional Congressional authorization (AA859-860); (3) it fails to consider alternatives that would address significant Project impacts by reducing flood risks and restoring ecological health; and (4) it fails to provide an informed and

---

[4]  *Alaska Wilderness Recreation and Tourism v. Morrison* ("*Alaska Wilderness*"), 67 F.3d 723, 729 (9th Cir. 1995); *see Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994).

- 45 -

meaningful consideration of alternatives, including by failing to disclose the full array of ecological impacts from all activities that would be carried out under the alternatives.

### 1.    The FSEIS Allows Only a Binary Choice Between the Project and the Project Without New Training Structures.

The FSEIS examines only two alternatives, the Continue Construction Alternative and the No New Construction Alternative.  AA859-871.  This violates NEPA's mandate to evaluate an appropriate range of alternatives for several reasons.  First, as shown below there are other clearly reasonable alternatives that should be examined because they achieve the Project's purpose while also reducing the Project's significant impacts.

Second, the scope and impacts of the Project mandate evaluation of a much broader range of alternatives than those that existed when Congress authorized the Project in 1927 based on a plan adopted in 1881 and updated in 1910.  AA863-864, 888-980; *Resources Ltd.,* 35 F.3d at 1307.  As noted, the greater the impacts and scope of the proposed action, the greater the range of alternatives that must be considered.[5]

Both the scope and the impacts of the Project are far-reaching.  The Project's new structures would install "4.4 million tons of rock" and its dredging would remove 2.4 million cubic yards of sediment per year.  AA871.  The Project is causing profound, direct, indirect, and cumulative impacts to 195 miles of the Mississippi River and its floodplain, and the hundreds of species that rely on that vital riverine and riparian habitat. AA382.

---

[5]    *Alaska Wilderness,* 67 F.3d at 729; *Sierra Club v. Espy*, 38 F.3d at 803.

The FSEIS admits the Project will destroy 1,100 acres of vital main channel border habitat, among other ecological harms.  AA864.  A 2016 study shows the narrowing caused by the Project's training structures and levees has fundamentally changed how the MMR responds to flood events.  AA984.  The Project's broad scope, duration and impacts dictate evaluation of a far greater range of alternatives than the binary choice in the FSEIS.  *Save Our Cumberland Mountains v. Kempthorne* ("*Cumberland*"), 453 F.3d 334, 345 (6th Cir. 2006).

In addition, the FSEIS should have examined an alternative that would remove some of the existing structures that the FSEIS admits are causing harm to habitat.  AA864, 984.  "'The consideration of alternatives requirement . . . guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project (*including total abandonment of the project*) which would alter the environmental impact and the cost-benefit balance.'"  *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 785 (9th Cir. 2006) (quoting  *Bob Marshall Alliance*, 852 F.2d at 1228 (emphasis in original)).

The District Court mistakenly concluded that the Corps satisfied NEPA by simply acknowledging and rejecting the Coalition's request for consideration of this alternative.  Order 18-19.  But NEPA has a separate requirement that the agency "study, develop and describe" alternatives to the project.  "NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place."  *Bob Marshall Alliance,* 852 F.2d at 1228.  This duty is not satisfied by merely responding  – and

- 47 -

rejecting – the public's requests for this required discussion. *Southeast Alaska Conservation Council v. Fed. Hwy. Admin.*, 649 F.3d 1050, 1057-1059 (9th Cir. 2011) (EIS addressing public's proposed alternative in response to comments, and not in the discussion of alternatives and their impacts, fails to provide 40 C.F.R. § 1502.14's required level of detail); *Bob Marshall Alliance,* 852 F.2d at 1228-1229 ("Informed and meaningful consideration of alternatives . . . is . . . an integral part of the statutory scheme" independent of the requirement to prepare an EIS); *Muckleshoot*, 177 F.3d at 813 (agency's failure to consider "an alternative . . . more consistent with its basic policy objectives" than the ones detailed in the EIS violated NEPA); *Environmental Defense Center v. Bureau of Ocean Energy Mgt.*, 36 F.4th at 877 (dismissing suggested reasonable alternatives in comment responses in appendix failed to "give full and meaningful consideration to all reasonable alternatives").

### 2. The FSEIS Ignores Alternatives Requiring Congressional Authorization.

An EIS must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency."[6]  This means an alternative may not be disregarded merely because it would require additional Congressional authorization.  *Id*.  Nor may an alternative be disregarded because it does not offer a complete solution to the problem.  *NRDC*, 458 F.2d at 836.  A viable but unexamined alternative renders an EIS inadequate.  *Muckleshoot,* 177 F.3d at 810, 814.

---

[6]  40 C.F.R. § 1502.14(c)(2017); *NRDC*, 458 F.2d at 837 ("NEPA was intended to provide a basis for consideration and choice by the decision-makers in the legislative as well as the executive branch."); *Environmental Defense Fund v. Froehlke*, 473 F.2d at 351 (acquisition of land to mitigate loss of land from river channel project must be considered even though it would require legislative action).

Contrary to this settled law, the FSEIS declined to consider alternatives that would potentially require additional Congressional action, including: (1) an alternative that removes or modifies existing river training structures in the Project area to restore backwater, side channel, and braided river habitat; and reduce flood risks even though the FSEIS admits that this alternative need not adversely affect navigation (AA939-940); (2) an alternative that maintains the authorized navigation channel by other means, including alternative upstream water level management regimes, alternative dredging and dredged spoil disposal activities, and the development of new, innovative techniques; and (3) an alternative that proposes ecological restoration and fish and wildlife conservation as authorized Project Purposes, and evaluates restoration activities that would improve the ecological health of the Mississippi River, its floodplain, and the fish and wildlife they support. AA669-673, 693-694, 778-779, 859-864.

Despite NEPA's mandate requiring a reasonable range of alternatives, and the compelling need to identify and evaluate less environmentally harmful alternatives, the FSEIS declines to consider any alternatives that the Corps currently deems outside its existing authorization, or that involve methods not specifically identified by Congress over a century ago. AA840, 857, 859.

Limiting the public's choice to either the Project, or the Project without training structures, violates NEPA. NEPA "prevents federal agencies from effectively reducing the discussion of environmentally sound alternatives to a binary choice between granting or denying an application."[7] The District Court

---

[7]  *Cumberland*, 453 F.3d at 345, *citing Davis v. Mineta,* 302 F.3d 1104, 1122 (10th Cir. 2002) ("[O]nly two alternatives were studied in detail: the no build alternative, and the preferred alternative. [The agency] acted arbitrarily and capriciously in approving an [environmental

ruled to the contrary that "nothing in *Muckleshoot* suggests that for each alternative an agency must be declined congressional authority before it may discard it as being unreasonable." Order 19-20. But the alternatives proposed by the Coalition were not unreasonable.

### 3. The FSEIS Fails to Evaluate a Reasonable Range of Effective Alternatives.

The FSEIS fails to evaluate clearly reasonable alternatives that achieve the project purpose while also reducing the Project's significant impacts, including the alternatives listed in section 2 above and similar ones.[8] AA669-673, 693-694, 778-779, 859-864. The Coalition requested consideration of each, to no avail. AA690-697.

As noted, the FSEIS refused to consider these alternatives, claiming they were outside existing Congressional authorization. AA670-673, 784-786. The Corps insisted it had to use the outdated techniques for carrying out the Project that Congress originally approved *110 years ago based on a Corps plan developed 139 years ago*. AA802-834, 840, 845, 857, 860. The Corps' refusal to examine any alternatives it claims to be outside its existing authorization, or different from those identified by Congress more than 100 years ago, renders the FSEIS inadequate as a matter of law. Common sense and modern science also clearly dictate a fundamentally different approach to evaluating alternatives.

---

assessment] that does not provide an adequate discussion of [p]roject alternatives."); *Colorado Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1174 (10th Cir. 1999) (NEPA forbids "agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative.").

[8] The Coalition requested these alternatives, and a National Academy of Sciences study, in their 2014 DSEIS Scoping Comments (AA772-773) and 2017 DSEIS Comments (AA1021-1039).

####    4.    The FSEIS Fails to Provide Informed Consideration of Alternatives.

NEPA requires an "informed and meaningful" consideration of alternatives: "NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place.  [Citation.]  Informed and meaningful consideration of alternatives – including the no action alternative – is thus an integral part of the statutory scheme."

*Bob Marshall Alliance v Hodel*, 852 F.2d at 1228.

The FSEIS fails to satisfy the "informed and meaningful" review requirement for the two alternatives that it does evaluate because it fails to provide meaningful information on the actions that will be carried out under those alternatives.  AA864-870.  Neither alternative provides criteria for the triggering of future dredging, revetment, or river training structure construction.  AA859-866.  Neither alternative provides information concerning the likely locations of these future actions.  *Id*.  Neither alternative adequately discloses and assesses the economic costs or environmental impacts of the likely future actions.  *Id*.  The Continue Construction Alternative does not provide any information on the types of river training structures that will be used, nor disclose and describe the linear extent of river training structures that will be constructed.  AA863-865.  Yet the total linear feet of river training structures has a significant impact on flood heights, as discussed.

Critically, the FSEIS fails to meaningfully consider alternatives because it

ignores the direct, indirect, and cumulative environmental impacts of the flow
regimes that the different alternatives would create, the conservation potential of
those alternatives, and the means to mitigate their adverse environmental impacts.
AA 625-646, 670-673, 676-736, 784-790, 878-884, 889-890, 928-931, 938; 40
C.F.R. § 1502.16 (2017).

The FSEIS also fails to provide "informed and meaningful" review of the
two options it does evaluate because that analysis was conducted with an
improperly narrow project purpose.  Indeed, this improperly narrow project
purpose of reducing the costs of dredging by building more river training
structures appears to be the determining factor in the FSEIS' selection of the
Continue Construction Alternative even though that alternative will, according to
the FSEIS, cause more environmental harm than the No New Construction
Alternative.  *Compare* AA868 (The No New Construction Alternative "[d]oes not
achieve Congressionally authorized project objective of reducing federal
expenditures by reducing dredging to a minimum") *with* AA870  ("Based on the
Project's Congressional authority and the continued benefit of the remaining
construction, the Continue Construction Alternative with the described potential
compensatory mitigation is the Preferred Alternative.").

## CONCLUSION

For these reasons, the District Court erred in ruling that the Corps did not violate WRDA and NEPA.  Therefore this Court should reverse its Judgment.

Dated:  October 12, 2022                    Respectfully submitted,

*s/ Stephan C. Volker*
STEPHAN C. VOLKER
ALEXIS E. KRIEG
STEPHANIE L. CLARKE

**CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7),**
**FRAP 32(G), AND CIRCUIT RULE 32(C)**

The undersigned, counsel of record for Plaintiffs-Appellants National Wildlife Federation, et al., furnishes the following in compliance with FRAP Rule 32(a)(7)(B)(i) and Circuit Rule 32(c) for a brief produced with a proportionally spaced 14-point font, Times New Roman.  The length of this brief is 13,769 words, excluding the parts of the document exempted by FRAP Rule 32(f), as counted by WordPerfect X7.

Dated:  October 12, 2022          s/  *Stephan C. Volker*
                                  Attorney for Appellants National Wildlife
                                  Federation, et al.,
                                  LAW OFFICES OF
                                  STEPHAN C. VOLKER
                                  1633 University Avenue
                                  Berkeley, California 94703
                                  Tel:  (510) 496-0600


**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), I certify that Appellants' Required Short Appendix contains all material required by Circuit Rule 30(a) and that Appellants' Separate Appendix contains all material required by Circuit Rule 30(b).


Dated:  October 12, 2022          s/  *Stephan C. Volker*
                                  Attorney for Appellants National Wildlife
                                  Federation, et al.,
                                  LAW OFFICES OF
                                  STEPHAN C. VOLKER
                                  1633 University Avenue
                                  Berkeley, California 94703
                                  Tel:  (510) 496-0600

| APPELLANTS' REQUIRED SHORT APPENDIX | | | | |
|---|---|---|---|---|
| Date | Title | Dkt | RSA Start | RSA End |
| 1/22/2022 | Memorandum and Order (on Cross Motions for Summary Judgment) | 55 | 1 | 40 |
| 1/25/2022 | Judgment in a Civil Action | 56 | 41 | 41 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, AMERICAN RIVERS, PRAIRIE RIVERS NETWORK, MISSOURI COALITION FOR THE ENVIRONMENT, and GREAT RIVERS HABITAT ALLIANCE,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, LT. GENERAL SCOTT A SPELLMON, Commanding General and Chief of Engineers, MAJOR GENERAL DIANA M. HOLLAND, Commander of the Mississippi Valley Division of the Army Corps of Engineers,<br><br>Defendants. | Case No. 20-cv-00443-DWD |

## <u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

This matter comes before the Court on the Plaintiffs' Motion for Summary Judgment (Doc. 34) and the Cross Motion for Summary Judgment filed by the Defendants. (Doc. 40). Plaintiffs consist of organizations dedicated to protecting the environment. (They are herein referred to collectively as "NWF"). NWF seeks this Court's review of the United States Army Corps of Engineers' ("Corps") Record of Decision ("ROD") approving its 2017 Regulating Works Project ("Project") and Final Supplemental Environmental Impact Statement ("FSEIS") on the Project's River training structures, including dikes, weirs, chevrons and bank hardening revetments ("regulating

1

works") and related operations and maintenance ("O&M") activities. (Doc. 34-1). Defendants in contrast seek determination that they have fully complied with the requirements of a variety of laws governing the Corps' activities related to the management and training of the Middle Mississippi River. ("MMR") (Doc. 40).

STANDARD OF REVIEW

This matter was instituted with the Plaintiffs' Complaint wherein they seek on administrative review a declaratory judgement that, generally, the Corps' ROD and FSEIS in 2017 was capricious and not in accordance with applicable laws. (Doc. 1, P. 94). Plaintiffs also seek injunctive relief. The parties have filed and briefed their respective motion for summary judgement. No party suggests that there are any remaining issues of material fact.

While a motion for summary judgment is a proper vehicle to bring to the court a factually undisputed controversy, the standard under Federal Rule of Civil Procedure 56 is not the same as that to be applied on administrative review.  This Court's review of the Corps' action under The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et. seq.* ("NEPA"), is governed by the Administrative Procedure Act ("APA"). *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003). The APA instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or it is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). Under this standard, although a reviewing court's

2

inquiry is "searching and careful ... the ultimate standard of review is a narrow one." *Mineta,* 349 F.3d at 952 (citations and quotations omitted).

A Court reviewing agency action is concerned primarily with whether the agency's decision was based on a consideration of the relevant factors and whether the agency has made a clear error in judgment. *Id*. at 952–53. "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Id*. at 953. In the context of NEPA, arbitrary and capricious review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Id*. (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, (1976)). "In fact, in applying the arbitrary and capricious standard, this Court's only role is to ensure that the agency has taken a hard look at environmental consequences." *Env't L. & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006)

## BACKGROUND AND HISTORY

The historical overview of the MMR, man's efforts to maintain and control the River over the past two centuries, and Congress' legislative endeavors to ensure that a balance is struck between the River's continued commercial navigability and the preservation of the regional ecological systems, associated resources, and wildlife, are largely undisputed by the parties.

The MMR consists of a 195-mile length of river between the Missouri River just above St. Louis, and its confluence with the Ohio River at the southern tip of Illinois.

3

(Doc. 34-1, P. 1). In its entirety, the Mississippi River Watershed drains 1,245,000 square miles – approximately one-third of the continental United States – including all or parts of thirty-two states and two Canadian provinces. (Doc. 34-1, P.5). It supports vast tracts of bottomland forest, wetlands, and aquatic habitats, and more than 300 species of birds, 57 species of mammals, 45 species of amphibians and reptiles, and 150 species of fish. *Id.* (AR 27950). The river supplies water to nearby and even somewhat distant populations, and, importantly, provides for a highly utilized means of commerce. Myriad communities of citizens along and nearby its flow depend on, not just the preservation of its ecological diversity and splendor, but also the River's capacity to allow for the continuation and even expansion of commerce.

In addition to its characteristic meandering flow, in the early 1800s, the River's width varied significantly from as much as 7,000 feet to as little as 4,000 feet, and the channel ranged width from 3,600 feet to as narrow as 125 feet, with depths varying between 3 to 7 feet. (*See* AR 2297-2329, Exhibit K, for historical synopsis of the uses and difficulty with training of the River during the 19th Century). Not that long ago, parts of the MMR remained very shallow and wide, and not fit to move deep draft and cargo-ladened vessels. To utilize the River, some level of control of it became necessary. But the MMR is not entirely manageable and seems to resist its management in places. The River, from time to time, ignores man's desires and purposes for it, and overflows its banks from an abundance of water, shallows from a want of water, and through erosion and accretion, changes its course and depths from the force of water.

4

Some might suggest that complete management of such a natural force is a bit of a fool's errand. However, the effort is viewed by Congress as necessary, and, beginning in 1824, it authorized the Corps to make improvements to the Mississippi River "for the purpose of obtaining and maintaining an inland navigation channel for waterway commercial transportation throughout the United States." (AR. 942). By 1881 the Mississippi River Commission, organized by an act of Congress, had formulated a plan to maintain navigability of the River by use of a system "of contraction, thus compelling the river to scour out its bed, this process being aided, if necessary by dredging." According to the Corps, by 1910, Congress authorized the ultimate plan for how the navigation channel should be obtained and maintained for a majority of the MMR and eventually established the current navigation channel dimensions of 9 feet deep and not less than 300 feet wide, with additional width in the bends as required in 1927. (AR 944-943). The consensus in the first decades of the 20th Century was to further its commitment to dredging as the primary tool to maintain suitable channel dimensions.[1]

Dredging proved to be less effective than hoped for, in part, due to the deposits of additional sediments from the Missouri confluence just north of St. Louis City. According to the Corps, the "dredging experiment" failed, so Congress constituted a special Board of Engineers to study the problem and determine the best way to maintain a navigable

---

[1] The Corps believes that Congress directed that the MMR's "appropriations were to be used first for dredging and whatever funds remained could be applied to the construction of permanent improvements". (AR 2301).

channel of suitable dimension. The Board "determined that an eight-foot channel would be sufficient for the MMR given the current amount of commerce, and such a depth would be best obtained and maintained through construction of permanent improvements, with dredging being used as a supplement to permanent improvements". (App. K-6; AR 2302). Congress authorized the Board's recommendations in the Rivers and Harbors Act dated June 26, 1910, which restored the 1881 MMR navigation channel project to be obtained and maintained through bank stabilization, the construction of regulating works, and rock removal. *Id.* But demands placed upon the River by commercial traffic sharply declined in the second decade of the 20th Century due to higher use of railways and the United States' entrance into World War I which caused a reduction in the availability of men to manage loading and unloading at the docks along the River. As a result, Congress reduced funding to a point that construction of new works halted, and even existing structures began to degrade for want of attention and repairs.

However, in 1924 the bourgeoning navigability issues with the River began worsening and this came to the attention of Congress which requested the Board of Engineers for Rivers and Harbors study the feasibility of creating and maintaining a nine-foot deep and 300-foot wide channel below St. Louis.   In 1926, the Board advised Congress that "interruptions to the work of contraction, due to reliance upon dredging, and meager appropriations" occurred between 1910 and 1925. (AR2303). The Corps points to this 1926 report for the proposition that "without sufficient permanent

6

improvements, navigation could only be maintained by dredging and 'it is impracticable to maintain a dredging fleet sufficient in number of dredges to safeguard the required depth at each bar." *Id.* The engineer who authored that report, Maj. Gotwals, stated that "at many of the crossings where continuous dredging was necessary in the past the regulating works have provided an adequate channel where no dredging is now necessary." (AR 2303). He added that "[a]lthough great benefits have resulted from the work already done, it is essential that additional regulating works and bank protection be carried to a point where minimum dredging is required and a stable channel is available at all times." *Id.* Maj. Gotwal's recommendation also observed that "the regulating works and revetment be completed and that dredging, which affords only temporary relief, be resorted to only when and to the extent that the needs of navigation then existing require." *Id.*

Support for the construction of regulating works in the MMR waxed and waned, tending to reflect economic concerns and realities more than beliefs as to the efficacy of the Project. During the depression, and into the 1940s, efforts to train and dominate the River expanded significantly, in some measure due to the efforts of Congress to stimulate a stagnate economy. However, in the 1950s, regulating works construction came to a complete halt, resulting in uncompleted work and unrepaired structures. By the early 1960s, growing environmental awareness and the need to temper progress with consideration, mitigation and, where necessary, avoidance of actual and potential harm

7

to affected ecosystems made its way to those in Congress, resulting in the passing of landmark legislation for the protection of our environment in 1969.

### THE NATIONAL ENVIRONMENTAL POLICY ACT

With the passage of The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et. seq.*, "Congress established the nation's central and unique environmental policy for (self-) regulating the federal government." *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997). For all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), federal agencies must articulate why they have settled upon a particular plan and what environmental harms (or benefits) their choice entails. *Id.* More specifically, the responsible official within the agency must provide a detailed statement reflecting (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C.A. § 4332(2)(C).

The primary purpose of an environmental impact statement required by § 4332 is to ensure agencies consider the environmental impacts of their actions in decision making. 40 C.F.R. § 1502.1. Accordingly, every time an agency prepares an environmental impact statement, it must answer three questions in order. First, what is the purpose of

8

the proposed project? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative? *Simmons* at 668.

NEPA does not, however, mandate that an agency reach any particular decision, only that the agency follows NEPA's procedures to arrive at an informed decision. *Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). It is therefore well-settled that even environmentally harmful projects will satisfy NEPA as long as the appropriate procedures are followed. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). In that sense, the rights NEPA provides are procedural, not substantive. *Yankee*, 435 U.S. at 558. In a nutshell, "NEPA mandates a searching inquiry into alternatives, but says nothing about which to choose." *Simmons*, 120 F.3d 664, 666. "It binds federal officials to justify their plans in public, after a full airing of alternatives. It thus blends a faith in technocratic expertise with a trust in democracy. Officials must think through the consequences of —and alternatives to—their contemplated acts; and citizens get a chance to hear and consider the rationales the officials offer." *Id* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). "But, if a federal agency has heard all the objections to a plan and considered all the sensible options before it, the agency has fulfilled its duty." *Id.*

### PLAINTIFFS' ALLEGATIONS OF NEPA VIOLATIONS

As mentioned above, the Corps discharges its statutory duties for the MMR through its Regulating Works Project. In 2017, the Corps adopted the ROD approving its

9

2017 Regulating Works Project and Final Supplemental Environmental Impact Statement ("FSEIS") on the Project's River training structures, including dikes, weirs, chevrons and bank hardening revetments and related operations and maintenance activities. The FSEIS supplements the Corps' Environmental Impact Statement which was completed in 1976.

Plaintiffs allege a variety of deficiencies in the Corps' FSEIS and consequent violations of NEPA. Generally, Plaintiffs suggest that the FSEIS (1) ignores the impacts of O&M activities (Doc. 34-1, P. 26); (2) its Purpose and Need is too narrow (Doc. 34-1, P. 27); (3) it ignores reasonable alternatives (Doc. 34-1, P. 30); and (4) fails to adequately analyze project impacts. (Doc. 34-1, P. 37). The Court will address each in turn.

## A. THE CORPS' O&M ACTIVITIES ALONG THE MMR

NWF complains that the FSEIS of May 2017 does not properly address the Project's operations and management activities, including revetments, dredging and spoils disposal. NWF argues that the impact of the continued dredging, whether under the present operations or pursuant to the proposed construction alternative, must be reevaluated for alternatives. (Doc. 34-1, P. 17). The Corps responds indicating that NWF mistakenly relies on an impact summary table (AR. 980), and points to evidence that the Corps did, in fact, consider and analyze dredging impacts. A review of the FSEIS reveals that the Corps considered and discussed the effects of dredging on water quality and turbidity, the downstream transport of contaminants, such as heavy metals and organics (AR. 1144-1146), Benthic Macroinvertebrate resources, fishery resources, entrainment of fish during dredging, habitat (AR. 1104-1111), noise (AR. 1108-1109, 1112), and air

10

pollution. Further, the Corps, in keeping with interagency Tier considerations, looked to and considered the biological opinions of the National Fish and Wildlife Service and its recommendations for emergency dredging limitations and monitoring in the effort to protect indigenous fish species. (AR 1050).

Next, NWF contends that the FSEIS should discuss "the significant changes [since 1976] in the river's ecological conditions, the many changes in environmental laws and policies mandating greater environmental protections, and scientific advances in understanding the Project's impacts." (Doc. 34-1, P. 17). Indeed, a new "hard look" and supplementation of the FSEIS can become necessary "where there are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. The Corps responds to NWF's complaints by stating that, in fact, "[t]he entire point of the FSEIS was to supplement the 1976 EIS due to new circumstances." (Doc. 40-1, P. 13).

The record reveals that the Corps believed that it was appropriate to supplement the 1976 EIS "due to the amount of the new information and circumstances that could affect the Project's impacts." (AR. 963). The FSEIS identifies a litany of "new circumstances", including, to highlight just a few: new federally protected species of fish and wildlife, new programs to restore populations of fish and wildlife, information on the impact of training structures, the impact of dredging, and technological information obtained from 3-D hydraulic models and studies of geometry and geomorphology to determine channel shape and characteristics over time. (AR 964-967). The FSEIS also

11

provides updated information on a variety of subjects including the MMR river channel, configuration and stages, water quality, air quality, aquatic and endangered species, cultural elements, effect of maintenance dredging, and impact of O&M on navigation channel and water quality. Further, the FSEIS identifies information found in the 1976 EIS that it still considers relevant and which it determined no updated information needed to be supplied. (AR. 965; *see also* Table 1-2 at AR. 966-968).

A review of the record reveals that the FSEIS does not ignore the impacts of O&M Activities. Rather, it demonstrates that a thorough investigation into the environmental impacts of the Project and alternatives was conducted. Still, there are conceivable circumstances and conditions that are present within and along the MMR that are not discussed or developed to NWF's liking, but there is no requirement under NEPA that every aspect of a project be studied *ad nauseum* or that all negative impacts of the project be eradicated.

## B. THE FSEIS AND ITS PURPOSE AND NEED STATEMENT

Next, the NWF complains generally that the Purpose and Need Statement contained in the FSEIS is too narrow such that "only the Project as proposed can qualify for approval, and other reasonable alternatives are eliminated" (Doc. 34-1, P17).  NWF further argues that FSEIS ignores environmental laws and authorizing legislation (Doc. 34-1, P. 18), and fails to demonstrate project need. (Doc. 34-1, P. 19). More to the point, NWF's criticism is that the statement effectively mandates continuation of the river

12

training structure and revetment construction to reduce dredging costs, regardless of flood risks and ecological impacts. (Doc. 34-1, P.18). In response, the Corps points out that the purpose and need is dictated by Congress' directive to maintain the MMR's navigation channel by using regulating works, with minimal supplemental dredging. The Corps adds that incorporating Congress' directives into the FSEIS's purpose and need statement did not violate NEPA. (Doc. 40-1, P. 14).

All "major Federal actions significantly affecting the quality of human environment" warrant a statement discussing the impact of the action. The requirement that there be a purpose and need statement serves "to ensure agencies consider the environmental impacts of their actions in decision making." 40 C.F.R. § 1502.140; C.F.R. § 1502.3; 42 USCA § 4332(C). The Council on Environmental Quality ("CEQ") regulations require that an agency preparing the statement "shall briefly specify the underlying purpose and need for the proposed action." 40 C.F.R. § 1502.13. The purpose and need statement "necessarily dictates the range of 'reasonable' alternatives." *Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); *see also Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) (reasonableness of a particular statement of purpose and need depends on both the nature and general goal of the project itself). In the end, the statement of a project's purpose and need is left to the agency's expertise and discretion, and Courts defer to the agency if that statement is reasonable. *Alliance for Legal Action v. FAA,* 69 Fed.Appx. 617, 622 (4th Cir. 2003).

13

In its "Purpose of and Need for Action" statement (AR 943), the Corps points to Senatorial records dating back to 1881 when the Mississippi River Commission ("MRC") declared that "the system to be pursued is that of contraction, thus compelling the river to scour its bed; this process being aided, if necessary by dredging." (AR 945; Senate Executive Doc. 10, 47th Congress, 1st Session). The Corps further indicates that in the Rivers and Harbors Act of 1910 Congress authorized obtaining and maintaining the MMR to be carried out in accordance with the 1881 MRC plan. *Id.* In the statement, the Corps also suggests that the Rivers and Harbors Act of 1927, which changed the authorized depth and width of the navigation channel, was based upon the Chief Engineer's Report which provided, in part: "it is essential that additional regulating works and bank protection be carried to a point where a minimum of dredging is required and a stable channel at all times . . . and that the regulating works and revetment be completed and that dredging, which affords only temporary relief, be resorted to only when and to the extent that the needs of navigation then existing require." *Id.*

While the overarching purpose of the project — keeping the channel navigable — may be universal along the MMR, the needs for each specific location are not. Several sites require recurrent dredging, producing millions of cubic yards of dredging material. (AR 959). These sites have proven to be more troubling and difficult to manage which translates into higher site-specific costs. The statement goes on to describe the differing needs at various locations along the MMR and how a reduction in the amount of dredging over the last few decades was attained by the installation of revetments and

14

training structures. (AR 959; 955). And, important to NWF's argument, the statement also reminds that it is appropriate to consider the economic impact of dredging because the purpose of the Regulating Works Project is to fulfill its goal of keeping the authorized channel navigable, but "with a goal of reducing costly dredging". *See* 40 C.F.R. § 1502.22 (AR 955). It points as well to the need for continued bank stabilization in certain locations through revetment construction and maintenance because unprotected banks along the MMR have historically experienced an annual erosion rate of as much as 10 feet. (AR 960). The Corps believes that the purpose and need of the project are better realized at certain locations along the MMR by less dredging and more training of the channel. And, while NWF may disagree with the Corps' belief, it is clear that the Purpose and Need statement at issue here meets the requirements of NEPA. 40 C.F.R. § 1502.140; C.F.R. §1502.3; 42 USCA § 4332(C).

Still, the NFW complains that the statement improperly limits alternatives. More specifically, NWF alleges that the "[b]ecause the FSEIS' Purpose and Need Statement assumes that only regulating works can achieve the Project's purposes, the FSEIS only considered two options: the project, and no project." (Doc. 34 at 27). Relatedly, NWF asserts that the statement "effectively mandates continuation of river training structure and revetment construction to reduce dredging cost, regardless of flood risks and ecological impacts, and disregards other less impactful alternatives." (Doc. 34-1 at 28). The Court disagrees.

It is true that how an agency fashions its Purpose and Need Statement can naturally include certain alternatives to the project while excluding others. And, certainly, an agency may through inventive articulation "contrive a purpose so slender as to define competing reasonable alternatives out of consideration" and thereby defeat the very underpinnings of the NEPA. *Simmons* 120 F. 3d 664, 666. NWF is concerned that the Corps' Purpose and Need Statement does just that. But there is nothing in the record that meaningfully supports the argument that the Corps tailored its Purpose and Need Statement to limit alternatives solely for the purpose of reducing costs even at the expense of the flood risks and negative ecological impacts. Here, the paramount goal for the Corps is to maintain a navigable waterway along the MMR, and there are a limited number of ways to accomplish this goal. One is to dredge. But dredging can be accomplished in numerous ways. Another is to construct training structures. Likewise, there are many types of structures that have and can be used to accomplish the purpose. The FSEIS discusses the numerous methods, and their known relative impacts on the river bottom and the general ecology along the MMR. Nevertheless, without identifying a specific alternative, NWF goes on to argue that the FSEIS fails to "rigorously explore and objectively evaluate all reasonable alternatives". (Doc. 134 at 31). However, as detailed further below, this argument is also unpersuasive.

C. THE FSEIS AND THE CORPS' CONSIDERATION OF ALTERNATIVES

An agency's EIS "should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis

16

presented in the sections on the affected environment and the environmental consequences." 40 C.F.R. § 1502.14. Specifically, the EIS must evaluate and discuss in detail reasonable alternatives to the proposed action, identify the no-action alternative discussed, identify the agency's preferred alternatives, identify appropriate mitigation measures, and limit consideration of alternatives to a reasonable number. Condensed, "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action." *Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664, 669 (7th Cir. 1997). An agency need not examine every conceivable alternative. Identifying, assessing, and comparing alternatives costs time and money, *see Metropolitan Edison v. People Vs. Nuclear Energy,* 460 U.S. 766, 776 (1983), and an agency should focus its energies only on the potentially feasible, not the unworkable. 40 C.F.R. §§ 1502.14(a)–(c), 1508.25(b)(2); *Simmons,* at 669.

NWF asserts that the FSEIS is contrary to settled law in that it failed to consider other alternatives such as (1) removal or modification of existing training structures "to restore backwater, side channel, and braided river habitat"; (2) upstream water level management regimes; (3) "an alternative that proposes ecological restoration and fish and wildlife conservation." (Doc. 34-1, at 33). While restoration of connected water river habitat, ecological repair, and conservation are all unarguably noble purposes and certainly appropriate for consideration by the Corps, NWF fails to point to evidence that would suggest that these are reasonable alternative methods to ensure the maintenance of a navigable waterway along the MMR.

17

Nevertheless, the record demonstrates that the Corp did not ignore reasonable alternatives. Here, the Corps did consider and address the proposed alternative of "altering water releases from the Upper Mississippi." (AR 972). The Corps indicated that the "locks and dams in the Upper Mississippi River have water control plans that address and maintain those particular projects' purposes under that authority". (AR. 972-973). The FSEIS also considers the efficacy of such a measure and found that "it was shown during the drought in 2012 that the impact of these alterations was not substantial enough to consider this as a reasonable alternative." (AR 972). Further, the FSEIS found that "ceasing all operations and maintenance activities on the Project was not considered [a] reasonable or feasible alternative due to the fact as it would not . . . [provide] a safe and dependable 9-foot navigation channel." (AR 974). It likewise addressed the proposed alternative of constructing locks and dams but it "was not considered a reasonable or viable alternative because it . . . was beyond the scope of the purpose of the SEIS to update the 1976 SEIS" and would require new Congressional authority to even be studied. (AR 974).

Contrary to NWF's assertion to the Court, the Corps also considered and addressed NWF's proposals that involved the removal of training structures to improve habitat. The FSEIS provides a detailed analysis of the effect of chevron dikes (AR 1117), bend way weirs (AR 1118), and revetments (AR 1119) on riverbank erosion and loss of habitat. (AR 1117-1136). The FSEIS also recognizes that the use of training structures will have impacts on fish, wildlife and habitat, and it specifically considered the removal and

18

modification of existing training structures as mitigation measures: "[M]any of the structures were designed by engineers without the assistance of modern numerical and physical model studies that are now used to optimize structure locations, configurations and spacing, etc." such that "opportunities now exist within the MMR to remove, shorten, notch, or otherwise alter configuration of existing river training structures." (AR 1133-1134). The Corps' consideration of NWF's proposals were much more than cursory reviews and this Court believes they were given a "hard look" sufficient to meet NEPA requirements.

NWF also argues that "an alternative may not be disregarded merely because it would require additional Congressional authorization" and that the Corps violated this "settled law" when it declined to consider alternatives that require Congressional approval. (Doc. 34-1 at 33-34). NWF cites to the case of *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) in support. The Court believes that NWF reads *Muckleshoot* expansively and more broadly than is reasonable. In *Muckleshoot*, the Court expressed its concern that the agency there declined to consider an otherwise reasonable alternative because it believed that the funds to support it were speculative, while, at the same time, the agency did consider other alternatives that were also dependent on arguably speculative funding. In short, the Court was "troubled by this selective willingness to rely upon the availability of funding sources beyond the [agency's] direct control." *Id.* However, nothing in *Muckleshoot* suggests that for each alternative an agency must be declined congressional authority before it may discard it

19

as being unreasonable. Little imagination is required to foresee the enormity of hurdles for all agencies if that was the law.  All agency progress to fulfil the purpose of its very existence would come to a halt while congressional approval was sought.[2] NWF fails to offer, and the Court is unable to find, anything within NEPA that would require that heightened level of scrutiny for each proposed alternative.

### D. THE FSEIS AND PROJECT IMPACT ANALYSES

Next, NWF lodges myriad complaints regarding, in its view, the shortcomings of the FSEIS in its analysis of the impacts of the project. (Doc. 34-1, 37). More specifically, NWF alleges that the FSEIS ignores science and data regarding the project's impact on flood heights and response, sediment loading, transport, and related hydrology, that the Corps improperly relied on defective and inadequate border habitat models, and that the FSEIS fails to meaningfully evaluate mitigation. (Doc. 34-1, Pp. 37-51).

The EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public" 40 C.F.R. 1502.14.[3]

---

[2] According to the Corps, it did seek modification of the Project's purpose to include structures to benefit aquatic resources, restoration of ecosystems, to no avail. *See* 33 USC §652(c) (declining to authorize recommendations); *see also* AR 2312-2318 for a discussion of the legislative history of the Water Resources and Development Act, 33 U.S.C. § 652.

[3] This section was amended effective September 14, 2020. It now provides, in pertinent part, "[t]he alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). *See* 40 C.F.R. § 1502.14.

Thus, NEPA requires an agency to consider and address in its EIS the anticipated environmental impact of not only the chosen project plan, but also those of the reasonable alternatives. The relative reasonableness of the chosen plan as well as those alternatives not chosen, can be accomplished by examining the environmental impact of each. This process of comparison lends itself to ensure that the chosen plan is weighed in the light of full public disclosure and involvement which furthers the goals of NEPA. But Congress' mechanism to attain those goals is largely procedural in that it requires that the agency take a "hard look" at the environmental consequences of reasonable alternatives. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (NEPA "does not mandate particular results," but "simply provides the necessary process" to ensure that federal agencies take a "hard look" at the environmental consequences of their actions). While the Corps did not comport its decision with the wants of NWF, this Court believes that the Corps did take a sufficiently hard look at the Project's impacts.

Many of the contentions advanced by NWF are planetary to a central argument that the Corps ignored available scientific advances and knowledge. But it is here that NWF conflates an outright refusal to consider science with a rejection of a contentious proposition after it is given due consideration. NWF maintains that the Corps "ignores overwhelming science and data showing a direct and irrefutable causal relationship between narrowing the river's channel due to Project training structures and raising the river's height." (Doc. 34-1, P. 38-39). Specifically, NWF complains that the Corps ignored studies conducted by local university professors, Pinter and Criss. (Doc. 34-1, P. 39). This

21

is simply incorrect. Appendix A to the FEIS entitled "Effects of [River Training Structures] on Flood Levels" is clearly arranged in such a fashion so as to highlight and consider countering points of view, studies, and observations on the issue of whether or to what degree training structures contribute to flooding. (AR. 1207-1238). The FSEIS analyzes numerous highly technical studies conducted by a variety of scientists and addresses some of the advantages and shortcomings of each. (AR. 1212). The relevant work of Pinter and Criss and the Corps' criticisms of their methodology and findings are discussed in detail.[4]

Also, in Appendix A are references to and consideration of other pertinent studies. (AR 1212, 1226-1228). The Corps' criticisms of these studies focus on inaccurate, incomplete, and irrelevant data, along with data analysis observed by studies conducted after Pinter's. The conclusions reached in Pinter's 2001 study are far from "irrefutable" and even today there is no "overwhelming scientific consensus" as NWF asserts. (Doc. 34-1, P. 45). In 2009, another study determined that Pinter's 2001 study failed to demonstrate that the relationship between stage trends on the MMR and dike construction is statistically significant. Nevertheless, the Corps also considered new

---

[4] As the Corps points out, the notion that training structures induce flooding along the MMR is not new. It has been studied and considered previously. In fact, in what is commonly referred to as *NWF I*, *National Wildlife Federation v. United States Army Corps of Engineers*, 2014 WL 6685235 (S.D. Ill. Nov. 24, 2014) this Court, Judge David Herndon (Ret.), considered the issue of whether injunctive relief was appropriate to prevent construction of any new river training structures in the Upper Mississippi River System. There too NWF argued that Dr. Pinter's studies conclusively demonstrated that river training structures increase flood levels. Since the time of the decision in *NWF I*, Dr. Pinter has conducted further studies. The Corps gave consideration to those new studies in Appendix A.

22

competing bodies of work that address possible correlations between training structures and flooding. (AR 1214-1216). The Corp then analyzed those works that found a positive correlation by assessing the methods and approaches used in each and found a variety of errors. Thus, the Corps did not ignore the science of flooding as NWF suggests; rather, the Corps simply rejected Pinter's understanding of it. There is an obvious divergence in opinion as to whether training structures bring about increased flooding, and while NWF may subscribe to those studies that find correlation, the FSEIS and Appendix A illustrate that the Corps fulfilled its obligation under NEPA to take a hard look at the science that addresses that question.

### E. THE INDEPENDENT PEER REVIEW PANEL'S COMMENTS & RECOMMENDATIONS

NWF next contends that the Corps failed to address comments and recommendations from an independent external peer review panel. Specifically, the Corps submitted a draft of the SEIS to an Independent External Peer Review panel ("IEPR"). The purpose of the IEPR is to ensure that the Corps' "documents are supported by the best scientific and technical information" and to "strengthen the quality and credibility" of the Corps' decision documents by reviewing the "soundness of the project study's assumptions, methods, analyses and calculations." (AR. 704). The IEPR made four recommendations in response to the SEIS draft. NWF represents that "contrary to NEPA, the Corps never addressed these recommendations." (Doc. 34-1. P42). This too is incorrect because, as the Corps points out, it addressed each recommendation of the IEPR and incorporated them into the FSEIS. (AR 670-80) Specifically, the Corps concurred with

23

some of those recommendations and incorporated corresponding changes to the FSEIS, particularly on the issues of types of structures to be used. Likewise, after the Corps provided its explanations in response to the IEPR recommendations, the IEPR panel concurred with the Corps' explanation. (AR 672). Further, when the IEPR panel recommended that the draft SEIS should include a revision to include information on sediment properties, the Corps expanded Chapter 3 of the SEIS accordingly (AR 677). These volleys of ideas, criticisms, explanations, and compromises illustrate here that the purposes of the NEPA directed at ensuring both unfettered public participation and independent procedural oversight have been served.

NWF also complains that the FSEIS lacks essential information on sediment loading, sediment transport, hydrology and hydraulics of the MMR. (Doc. 34-1. P. 39). More specifically, NWF argues that "the FSEIS does not reflect up-to-date science because it omits essential data and analysis on current sediment loading, sediment transport, hydrology and hydraulics." (Doc. 34-1, P. 40). In support of this argument NWF represents to the Court that the "IEPR Report also *concluded* that 'the SEIS has little information on the hydraulic and hydrologic engineering data for the MMR.'" (emphasis added) (Doc. 34-1. P. 40). However, NWF's reference is not only incomplete, but also misleading. A reading of the entire referenced sentence leaves no room for anything but the conclusion that the information available was adequate. The sentence in its entirety reads: "Although the SEIS has little information on the hydraulic and hydrologic engineering data for the MMR, the 1976 EIS on the MMR was reviewed for this data and

24

it was found to be complete and suitable for SEIS review." (AR 6964). The adequacy of

data and information make up the mainstay for a realistic "hard look" and allegations of

inadequate data and information naturally suggest arbitrary decision making on the part

of the agency. Here, quite contrary to the representations of NWF, the IEPR panel found

the applicable data to be complete. Further, the Corps did not act arbitrarily when it

looked to hydraulic and hydrological engineering data from 1976. Accordingly, the Court

finds that the Corps adequately addressed in a responsive and thorough manner the

concerns and recommendations raised by the IEPR.[5]

## F. THE MAIN CHANNEL BORDER HABITAT MODEL

NWF complains that the Corps' modeling lacks adequate supporting data and

information. Specifically, NWF challenges the Corps' use of the Main Channel Border

Habitat Model and the Nineteen Mile Modeled Reach.  NWF asserts that the Main

---

[5]The Court is concerned with the lack of candor on some of the issues raised by NWF and representations made to this Court about the content of the record. It is worthy of note that the record in this matter consists of over 49,000 pages. The issues raised on review here, as with most any case brought for review under the ARA, requires a delving into the record. Apart from the large volume of documents contained in the record, NEPA cases become particularly burdensome because the analysis often takes the Court into a highly technical realm requiring a development of specialized knowledge.  Any lack of candor on the part of counsel as to the contents of the record is particularly offensive because it requires the assignment of additional resources to check and recheck the record to test the veracity of counsel's representations. Mischaracterizing the contents of the record or omitting important or operative terms contained in a sentence in the record violates the lawyers most basic duty to a tribunal – the duty of candor. While advocacy always demand zeal, both are secondary to the attorney's duty of candor and truthfulness. *United States Dep't of Hous. and Urban Dev. v. Cost Control Mktg. & Sales Management of Va., Inc.,* 64 F.3d 920, 925 (4th Cir.1994) ("a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy"); *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 458 (4th Cir.1993) ("the lawyer's duties to ... advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit").

Channel Border Habitat Model is incomplete and that the Nineteen Mile Modeled Reach fails to address the locations, types and extent of river training structures to be deployed by the Project. (Doc. 34-1, P. 40-42). The Corps recognized that "[a]n acceptable habitat model is not available to assess habitat quality for key [Main Channel Border] habitat" and that such a model "is needed to better understand how river training structures impact shallow to moderate-depth, moderate-to high-velocity habitat." (AR 394).

The Main Channel Border Habitat Model was initiated by the Corps to assist in future impact assessment and mitigation planning by focusing on "the specific aspects of the main channel border habitat that this Project impacts." It was "[d]ue to the lack of existing models [that] the District made the decision to develop a new model that would adequately represent the key MMR habitat variables adversely affected by river training structure construction" (AR 397). To that end, the Corps chose to utilize the Sturgeon Chub Model that is intended to help quantify the effects of river training structure construction and modification on the quality of Sturgeon Chub habitat. *Id.* Additionally, the Sturgeon Chub Model is to be "used to evaluate the project actions that impact key variables in main channel border habitat of the MMR." *Id.* Nevertheless, NWF contends that "[b]y relying on an incomplete study without sufficient justification the Corps failed to take the hard look that NEPA requires" and that the "model should have been completed and certified before it was used to assess impacts." (Doc. 34-1, P. 41 and 42).

In *Sierra Club, Illinois Chapter v. U.S. Dep't of Transp.,* 962 F. Supp. 1037 (N.D. Ill. 1997) the court considered whether that agency's description of a project was excessively

narrow when the agency relied on a single population forecast to analyze whether to build a roadway. *Id* at 1043. The court determined that "when there is incomplete or unavailable information as to the impact of a proposed action, and that information is essential to make a reasoned choice among alternatives, NEPA requires an agency to make clear in the final impact statement that the study was not undertaken and that there are reasons the study was not undertaken." *Id.*; *see* 40 C.F.R. § 1502.22. Here, the Corps recognized the lack of specific knowledge regarding certain impacts of training structures, disclosed that fact publicly, and then conducted a three-day interagency workshop with the U.S. Fish and Wildlife Service, the Missouri Department of Conservation, the Illinois Department of Natural Resources, and experts in the fields of model development, fisheries biology, river ecology, river hydraulics, and river maintenance to develop an effective model. (AR 399). Toward the certification of the use of the Sturgeon Chub Model, a team of independent reviewers were then consulted, their comments and recommendations were considered, and in some cases, integrated by the Corps. (AR385; 412-433). Clearly, the Corps did not ignore the need for a workable model to address channel border habitat, nor did it fail to make the lack of new comprehensive study or model known. Rather the Corps reasoned that because the MMR is uniquely varying and dynamic, it is appropriate to study each future construction site independently and apply parameters of existing and developing models to each such site.

The Nineteen Mile Modeled Reach was created as a means of programmatic analysis because "it was not feasible to model the entire MMR due to budget, time and

technological restraints." (AR 1121). However, the Corps considered a 19-mile stretch of the MMR near Chester, Illinois which the Corps believes is representative of the entire 195-mile MMR because it "contains the majority of the structure and habitat types in the MMR, has good bathymetric (data regarding submarine terrain) and is of an appropriate length for maximizing data output and minimizing computation requirements." (AR 1122). The Corps developed the Nineteen Mile reach model to analyze otherwise unknowable impacts on channel border habitat because it concluded that "continued conversion to structured main channel habitat is expected to have a significant adverse effect on the MMR fish community, and . . . may warrant compensatory mitigation." (Doc. 40-1, P. 51; AR 1132).

The FSEIS also addressed the difficulty in projecting with certainty the best location of training structures throughout the MMR:

> One of the recurring challenges with determining the future impacts of implementation of the Regulating Works Project on the human environment is the fact that the exact locations of future work sites and the exact structures to be used are not known. Given the dynamic nature of the MMR, work sites are developed on an ongoing basis as dredging issues arise and the set of structures to be used to address dredging issues at each location is developed based on the unique characteristics of each site. Because of these uncertainties in location and configuration of future structures, it was necessary to use existing dike fields within the modeled reach to serve as surrogates for work sites to estimate future impacts.

(AR 1123).

Because this is an ongoing project the environmental impacts of which, according to the Corps, have been forecasted as much as current technology allows, deference to

28

the insight and expertise of participating Corps engineers, biologists, and scientists, together with those in agency partnership with them, is warranted. This Court finds that, under the circumstances reflected in the record, it is not necessarily arbitrary for an agency to defer site specific impact and mitigation analysis until the exact project sites can be identified, particularly when faced with a constantly changing and inhomogeneous theatre of project operation, such as the MMR. According to the record, the need for maintenance of the depth and breadth of the channel has historically varied along the river and there is nothing to suggest that has changed. As the Corps alludes to, natural changes in flow volume and velocity alters the course of the banks and substrate through a constant process of erosion and accretion sometimes in unpredictable ways such that forecasting exact site locations along the 195-mile stretch is not practicable. It must be kept in mind that the Corps has the Congressionally imposed obligation to maintain a navigable waterway. At the same time, it must examine and analyze all reasonable means and alternatives with constant consideration of the impact that each pose to our environment. True, the determination to defer identification of future worksites is not ideal. However, the Corps was neither arbitrary nor capricious in reaching its decision to defer site-specific analysis and mitigation and utilize an existing model to determine the efficacy of placement of river training structures.

In sum, Plaintiffs' allegations concerning NEPA violations are unpersuasive, and the Court finds that the Corps complied with its requirements under NEPA, and none of the Corps' decisions related to the alleged NEPA violations were arbitrary, capricious, an

29

abuse of discretion, or otherwise not in accordance with the Administrative Procedures Act.

### ALLEGED VIOLATIONS OF THE WATER RESOURCES DEVELOPMENT ACT

NWF also claims that the Corps violated the Water Resources Development Act ("WRDA") by failing "to prepare a detailed mitigation plan". Specifically, NWF points the Court to 33 U.S.C. §§ 2283(a)(1) and 2283(d)(1).  Section 2283(d)(1) provides:

> (d)(1) After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, and shall not select a project alternative in any report, unless such report contains (A) a recommendation with a specific plan to mitigate for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project, or (B) a determination by the Secretary that such project will have negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures.[6]

---

[6] Once again NWF's counsel has been misleading in its argument. Significantly, NWF does not accurately and completely recite the language found in § 2283(d)(1). This may explain why counsel does not argue for and simply skips by any interpretation of that provision. (*See* Doc. 34-1, P. 52 and Doc. 43, P. 28-29). Specifically, NWF found it appropriate to omit the part of the statute that refers to such reports as those that are to be submitted as a proposal to Congress. Nothing in this section specifically refers to EIS, SEIS or FSEIS. While statements of fact and arguments lacking candor are always troubling, the extensive record and complex issues presented in this case made NWF's disingenuous statements even more burdensome for the Court. And, while the Court recognizes the passion of the Plaintiffs and their supporters for the work that they do to protect the environment and wildlife, their cause is not, in the end, furthered by misrepresentations of the law and contents of the record. Such ignoble conduct, though for noble purposes, never wins the day. Counsel is cautioned to thoroughly review Federal Rule of Civil Procedure 11.  Future disingenuousness of this magnitude will not be tolerated by the Court and may result in sanctions. See, e.g., *Matter of Hendrix*, 986 F.2d 195, 201 (7th Cir. 1993) (In deciding whether a lawyer has engaged in sanctionable conduct, courts look to the rules of professional conduct and Rule 11).

A reading of Section 2283(d)(1) reveals that it addresses only proposals for authorization of water resources in reports to Congress. And, while Section 2283(d)(1) might have been more succinctly articulated, this Court disagrees that its language is ambiguous or that it is susceptible to more than one *reasonable* interpretation. *See Hammer v. United States Dep't of Health & Hum. Servs.*, 905 F.3d 517, 528 (7th Cir. 2018) ("we cannot ignore the plain meaning of the statute because Congress could have, arguably, made the statute's meaning even plainer"); *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012) ("the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute"). The mere ability of a party to conceive of any meaning other than the clear meaning of a statute does not render it ambiguous for interpretation purposes.

Giving the words used in Section 2283(d)(1) their usual and customary meaning reveals a sentence structure that cannot support a reading other than that Congress decided to require reports submitted to *it*, either as a proposal for authorization or as an alternative to the project, to contain a mitigation plan unless the impact is negligible. To assume, as NWF does here, that the word "report" which is used in the very narrow sense (reports to Congress) and that in the same sentence Congress assigned to it an all-encompassing and universal meaning (reports of all kinds including statements of environmental impact) does not create a basis for ambiguity. Subscribing to NWF's assumption would require this Court to travel, in the search for Congress' meaning, beyond the borders of the statute itself. *See United States v Great Northern Ry,* 287 US 144, 154 (1932). The natural reading of the statute leaves no room for a finding that it is

31

susceptible to the interpretation NWF assumes. Regardless, even if Section 2283(d)(1) is ambiguous in the context NWF describes, an application of standard rules of construction would not change the result.

As with all questions of statutory construction, the proper place of beginning is the statute itself. But statutory language "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citing *Roberts v. Sea–Land Services, Inc.*, 566 U.S. 1350, 1357 (2012)); *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear."). And a court's "job is to interpret the words consistent with their ordinary meaning." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018)

The word "report" as a noun can and does have a number of commonly understood meanings attached to it, the differences being dependent most often on the context being used. *See* https://www.merriam-webster.com/dictionary/report (last visited January 10, 2022) ("a story in a newspaper or on radio or television that is about something that happened or that gives information about something"; "a written or spoken description of a situation, event, etc."; "an official document that gives information about a particular subject."). Giving it its ordinary, everyday meaning the

32

word "report" might well include an "EIS" because the EIS conceivably can be argued to have some characteristics of a report in that it conveys to the public information regarding an impending major federal action.  The "primary purpose" of an EIS "is to ensure agencies consider the environmental impacts of *their action in decision making*". 40 CFR §1502.1 (emphasis added). However, NWF fails to point to a single instance where "EIS" or "ROD" is used interchangeably with the term "report" so as to suggest that when Congress uses one it intends that the other be included as well.   Moreover, "Environmental impact statement" is a technical term of art born of and defined within the NEPA. 42 U.S.C.A §4332. An often looked to canon of interpretation that is applicable here recognizes that when the law is the subject, the *legal meaning* is to be expected which often differs from the common meaning.   *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 73, (2012)*; see, e.g., Van Buren v. United States*, 141 S.Ct. 1648, 1657 (2021) ("When interpreting statutes, courts take note of terms that carry 'technical meaning[s]'"); *Digital Realty Trust, Inc. v. Somers*, 138 S.Ct. 767, 776-777 (2018) ("When a statute includes an explicit definition, we must follow the definition, even if it varies from a term's ordinary meaning.").   Although "report" is not specifically defined in the WRDA, it is difficult to fathom that Congress would resort to using a commonly employed polyseme as an operative term in a later law to replace its own unique term of art — "environmental impact statement" — created for the purpose of facilitating landmark legislation like NEPA. *See Harco Holdings, Inc. U.S.* 977 F.2d 1027, 1032 (7th Cir. 1992). Thus, the technical nature of the term "EIS" or "ROD" strongly suggests that it is

Appellants' Required Short Appendix
33

not included within the term "report" under the WRDA. This finding is only supported by Congress' use of the term "report" elsewhere in the WRDA.

Within the Water Resources Development Act, Congress has established specific requirements for Corps' reports concerning water resources projects. Provisions of the WRDA strongly suggest that the term "report" constitutes reports submitted to Congress related to the planning and authorization of water resources projects. These provisions discuss requirements for the Corps' reports related to water resources projects which require specific authorization from Congress. For example, Section 2282a(f)(2), provides "Report completion- The completion of a report of the Chief of Engineers for a water resources project-- (B) shall be submitted, on completion, to--(i) the Committee on Environment and Public Works of the Senate; and(ii) the Committee on Transportation and Infrastructure of the House of Representatives." Further, Section 2282a(g) provides that "not later than 120 days after the date of completion of a report of the Chief of Engineers that recommends to Congress a water resources project, the Secretary shall-- (A) review the report; and (B) provide any recommendations of the Secretary regarding the water resources project to Congress." The WRDA also describes project reports, general reevaluation reports, limited reevaluation reports, limited revaluation reports, and feasibility reports that must be prepared for any water resources project requiring specific authorization from Congress. *See* 33 U.S.C. §§ 2215(d) and 2282(a); *see also ACF Basin Water Litig*, 467 F. Supp. 1332. Thus, one aspect of the statutory scheme of the WRDA is for the submission of reports to Congress in the quest for legislative approval,

34

not for an agency's issuance of an EIS, FEIS, FSEIS or ROD. Since the entirety of NWF's argument rises or falls on its interpretation of Section 2283, its claim that the Corps violated that provision also fails.

### Alleged Violations of the Fish & Wildlife Coordination Act

Next, NWF complains that the Corps violated the Fish and Wildlife Coordination Act, ("FWCA") 16 U.S.C.A. §661, et. seq. in that the Corps failed to consult with and obtain a report from the Fish and Wildlife Service ("FWS") before approving the Project. (Doc. 34-1, P. 49) The Corps responds arguing that the FWCA is not applicable and that, even if it is applicable, the Corps complied with the Act because it consulted with the FWS and state agencies. (Doc. 40-1, P. 59)

The FWCA is not "applicable to any project or unit thereof authorized before the date of enactment of the Fish and Wildlife Coordination Act if the construction of the particular project or unit thereof has been substantially completed." A project is "considered to be substantially completed when sixty percent or more of the estimated construction cost has been obligated for expenditure." 16 U.S.C.A. § 662 (West). The Corps contends that the Project was substantially complete as of the FWCA's enactment in 1958. But the Plaintiffs also argue that because the Project was modified or supplemented after 1958, the FWCA requires the Corps to consult and secure reports from the FWS and state agencies. (Doc. 34-1, P. 56). The Corps contends, however, that it did not modify or supplement the Project since 1927. (Doc. 40-1, P. 58).

As NFW points out, the Corps does not demonstrate that the record provides any historical or projected spending analysis from which it can determined whether the Project is "substantially complete". Moreover, the Corps does not point to any specific evidence that the Project was not modified or supplemented so as to make compliance with the FWCA's consulting and reporting requirements unnecessary. In short, there are factual disputes which prevent a summary judgment in favor of the Corps on the issue of applicability of the FWCA. But, the presence of issues of material fact as to application of FWCA does not end the inquiry because the record does demonstrate that the Corps has adequately met the consultation and reporting requirements of the Act.

Section 662(a) provides that "whenever the waters of any stream or other body of water are proposed or authorized to be" . . . "diverted, the channel deepened, or the stream or other body of water otherwise controlled" . . . the "agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein" . . . "the diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources . . ." 16 U.S.C.A. § 662 (West).

Section 662(b) provides in pertinent part that "any report of the head of the State agency exercising administration over the wildlife resources of the State . . . shall be made an integral part of any report prepared or submitted by any agency . . . responsible for engineering surveys and construction of such projects when such reports are presented .

36

. . to any agency . . . having the authority . . . to approve a report on the modification or supplementation of plans for previously authorized projects, to which this Act applies." 16 U.S.C.A. § 662 (West).

NWF contends that the Corps failed to consult the FWS or appropriate state agencies for the purpose of preventing loss and damage to wildlife resources as required by §662(a). To the contrary, the record supports the Corps' position that it did fulfill its consultation obligations. The Department of the Interior, in conjunction with FWS, submitted over one hundred "comments" in response to the Corps' consultation with FWS. (AR 1314-1335). The Missouri Department of Conservation and the Illinois Department of Conservation each submitted numerous comments and suggestions to the Corps. (AR 1336-1345). Each of the comments and suggestions were made part of the FSEIS in its Appendix E. The record illustrates that in response to these comments, the Corps addressed in great detail the concerns raised by NWF on a myriad of issues. The Corps responses are also part of the FSEIS. (AR 1357- 1413). In some instances, the Corps adopted the recommendations contained in the comments. In others, the Corps provided explanation and reference in support of its responses. In some responses, the Corps invited further consultation and cooperation, particularly with regard site-specific and programmatic issues. Agreement and consensus were not reached on each comment posed and, in those instances, the Corps makes clear its position and intended direction. The Court, having reviewed each of the responses, is unable to locate any that could be said to be insensitive, indifferent, or obtuse toward the corresponding comment or

37

expression of concern. NWF's argument that the Corps violated the FWCA by failing to consult with the FWS is simply not supported by the record.

NWF suggests almost in passing, and certainly without analytical development, that it was incumbent upon the Corps to direct the FWCA prepare a "report". (Doc. 34-1, P. 59). NWF fails to provide any basis for the suggestion that the Corps had the authority or power to do so, and nothing contained in the FWCA suggests that the Corps possesses such a cudgel.

This Court finds that the Corps has complied with the consultation and reporting requirements of the FWCA.

### ALLEGED VIOLATIONS OF THE 1927 RIVERS & HARBORS ACT

Plaintiffs' final claim is that the Corps violated the 1927 Rivers and Harbors Act by utilizing a 1,500-foot contraction plan and building river structures to reduce project costs by reducing the amount of dredging. (Doc. 34-1, P.50). There is no dispute that the Corps Project authority is limited by the 1927 RHA and that the Chief of Engineers Report limited the Corps' management of the Project. (Doc. 40-1, P. 53). Rather, NFW goes further and claims that the Act specifically limited the contraction width to a distance between 2,500 and 2,000 feet.

Indeed, the contention here arises out of an appropriations bill enacted in January 1927 creating "An Act authorizing the construction, repair, and preservation of certain public works" on many rivers and waterways throughout the United States. The then "existing project" involving the Mississippi River from St. louis to the mouth of the Ohio

38

River was "modified in accordance with the recommendations submitted by the Chief of Engineers in letter to the Chairman of the Rivers and Harbors Committee of the House of Representatives, dated December 17, 1926." 69 Cong. Ch. 47, January 21, 1927. NWF claims that paragraph 57 of "the 1926 Chief of Engineers Report established the following explicit limitations on the Project: (1) Constriction of the channel through regulating works and revetment is limited to a conservative width of 2,500 to 2,000 feet . . ." (Doc. 34-1, P.59) (AR 46968). But the Chief of Engineers Report does not create any such "explicit limitations" on the authority of the Corps and instead suggests in the body of his letter that "[t]he contraction be brought about by the regulating works" that "causes much less change in the original condition of the river than either the project of 1881 . . ." (AR 46968). "The 1881 project contemplated contraction to a width of about 2,500 feet." *Id*. In fact, Major Gotwals, the author, did not mention any specific limitation in the "Recommendations" section of his letter and only addresses the issue of contraction to say "[t]hat the regulating works of contraction and revetment be continued and completed". (AR 46975). So, while the Act does impose some limitations on the authority of the Corps, restricting it to any specific contraction width is not one of them.

NWF's argument that the 1927 River and Harbors Act created explicit limitations on the authority of the Corps to increase the amount of contraction in its efforts to fulfill its Congressionally imposed duty to maintain a navigable channel is not supported by the record. Accordingly, the Court finds that the Corps did not violate the 1927 Rivers and Harbors Act as alleged.

CONCLUSION

The issues raised by the parties in their motions are largely the same due to the nature of the review necessary under the Administrative Procedure Act. Although these issues were discussed together, the Court nevertheless considered the parties' respective motions for summary judgment separately and on their own merits, and, where appropriate, construed all facts and inferences in favor of the party against which the motion under consideration was made. See *Blow v Bijora, Inc*. 855 F. 3d 793 (7th Cir. 2017)

In sum, the Plaintiffs have not revealed any clear error of judgment on the part of the Corps. Further, none of the Corps' decisions in this matter were shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Administrative Procedures Act.   Therefore, having determined that the Corps has followed the appropriate procedures, considered the relevant facts, and came to reasoned decisions, Plaintiffs' Motion for Summary Judgment (Doc. 34) is **DENIED**.   Defendants' Cross-Motion for Summary Judgment (Doc. 40) is **GRANTED**.

The Clerk of Court is directed to enter judgment against Plaintiffs, and in favor of Defendants and close this case.

    **SO ORDERED.**

    Dated: January 22, 2022

_____
DAVID W. DUGAN
United States District Judge

40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

NATIONAL WILDLIFE FEDERATION, )
ET AL, )
 )
                      Plaintiffs, )
 )
vs. )         Case No. 3:20-cv-443-DWD
 )
UNITED STATES ARMY CORPS OF )
ENGINEERS, ET AL, )
 )
                 Defendants. )

## JUDGMENT IN A CIVIL ACTION

**DUGAN, District Judge:**

      **IT IS ORDERED AND ADJUDGED** that pursuant to the Memorandum and Order

(Doc. 55) entered by this Court on January 22, 2022, Judgment is entered in favor of Defendants

and against Plaintiffs.

      **IT IS SO ORDERED.**

      **DATED: January 25, 2022**

                      **MARGARET M. ROBERTIE, Clerk of Court**

                      *s/ Dana M. Winkeler*
                      **Deputy Clerk**

**Approved:** *s/ David W. Dugan*
**David W. Dugan, U.S. District Judge**

Page | 1